Nos. 23-12408-E & 23-12411-J (consolidated)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

BLAKE WARNER,
*Plaintiff-Appellant,*

v.

SCHOOL BOARD OF HILLSBOROUGH COUNTY, FLORIDA,
*Defendant-Appellee.*

◆

On Appeal from the United States District Court
for the Middle District of Florida
(8:23-cv-00181-SDM-JSS & 8:23-cv-01029-SDM-SPF)

## APPENDIX
## (VOLUME I)

Jeffrey C. Mateer
Hiram S. Sasser, III
David J. Hacker
Justin E. Butterfield
**FIRST LIBERTY INSTITUTE**
2001 W. Plano Pkwy., Suite 1600
Plano, Texas 75075
Tel: 972.941.4444
Fax: 972.941.4457
jmateer@firstliberty.org
hsasser@firstliberty.org
dhacker@firstliberty.org
jbutterfield@firstliberty.org

Aaron M. Streett
**BAKER BOTTS L.L.P.**
910 Louisiana Street
Houston, Texas 77002-4995
Tel: 713.229.1234
Fax: 713.229.1522
aaron.streett@bakerbotts.com

Matthew P. Erickson
Matthew M. Hilderbrand
**BAKER BOTTS L.L.P.**
401 South 1st Street, Suite 1300
Austin, Texas 78704-1296
Tel: 512.322.2500
Fax: 512.322.2501
matthew.erickson@bakerbotts.com
matthew.hilderbrand@bakerbotts.com

*Attorneys for Appellant Blake Warner*

# INDEX

**Docket/Tab #**

<u>Volume I – No. 8:23-cv-00181-SDM-JSS</u>

Docket Sheet..................................................................................... A

Plaintiff's Verified Complaint (Jan. 26, 2023).....................................1

Plaintiff's Amended Verified Complaint (May 18, 2023)...............................29

Defendant's Answer and Affirmative Defenses to Amended Verified Complaint (May 30, 2023) .....................................................................30

Copy of Order dismissing complaint (July 6, 2023)........................................37

Plaintiff's Second Amended Verified Complaint (July 10, 2023)...................38

Order denying motions to consolidate, to strike, and for judgment on the pleadings as moot (July 11, 2023) ...........................................39

Plaintiff's Notice of Appeal to the Eleventh Circuit Court of Appeals (July 21, 2023) ..........................................................................42

<u>Volume II – No. 8:23-cv-01029-SDM-SPF</u>

Docket Sheet..................................................................................... A

Plaintiff's Verified Complaint (May 10, 2023) ....................................1

Plaintiff's Amended Verified Complaint (May 31, 2023)...............................19

Order dismissing complaint (July 5, 2023)........................................28

Plaintiff's Notice of Appeal to the Eleventh Circuit Court of Appeals (July 21, 2023) ..........................................................................29

Dated: December 1, 2023

Respectfully submitted,

*/s/ Matthew P. Erickson*

BAKER BOTTS L.L.P.

Jeffrey C. Mateer
Hiram S. Sasser, III
David J. Hacker
Justin E. Butterfield
**FIRST LIBERTY INSTITUTE**
2001 W. Plano Pkwy., Suite 1600
Plano, Texas 75075
Tel: 972.941.4444
Fax: 972.941.4457
jmateer@firstliberty.org
hsasser@firstliberty.org
dhacker@firstliberty.org
jbutterfield@firstliberty.org

Matthew P. Erickson
Matthew M. Hilderbrand
**BAKER BOTTS L.L.P.**
401 South 1st Street, Suite 1300
Austin, Texas 78704-1296
Tel: 512.322.2500
Fax: 512.322.2501
matthew.erickson@bakerbotts.com
matthew.hilderbrand@bakerbotts.com

Aaron M. Streett
**BAKER BOTTS L.L.P.**
910 Louisiana Street
Houston, Texas 77002-4995
Tel: 713.229.1234
Fax: 713.229.1522
aaron.streett@bakerbotts.com

*Attorneys for Plaintiff-Appellant*
*Blake Warner*

ii

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2023, I electronically filed this appendix and thereby served all counsel of record through the Court's CM/ECF system.

_/s/ Matthew P. Erickson_
Matthew P. Erickson

# Tab A

## U.S. District Court
## Middle District of Florida (Tampa)
## CIVIL DOCKET FOR CASE #: 8:23–cv–00181–SDM–JSS

Warner v. School Board of Hillsborough County, Florida
Assigned to: Judge Steven D. Merryday
Referred to: Magistrate Judge Julie S. Sneed
Case in other court:  11th Circuit, 23–12408–E
Cause: 42:1983 Civil Rights Act

Date Filed: 01/26/2023
Jury Demand: None
Nature of Suit: 448 Civil Rights: Education
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 01/26/2023 | 1 | COMPLAINT against School Board of Hillsborough County, Florida Filing fee $402.00, receipt number TPA 67976 filed by Blake A. Warner. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E)(AM) (Entered: 01/26/2023) |
| 01/26/2023 | 2 | ***STRICKEN PURSUANT TO ORDER 22*** MOTION for Preliminary Injunction by Blake A. Warner. (AM) Modified on 2/14/2023 (CTR). (Entered: 01/26/2023) |
| 01/26/2023 | 3 | MEMORANDUM of Law in support re 2 Motion for Preliminary Injunction filed by Blake A. Warner. (AM) (Entered: 01/26/2023) |
| 01/26/2023 | 4 | SUMMONS issued as to School Board of Hillsborough County, Florida. (AM) (Entered: 01/26/2023) |
| 01/27/2023 | 5 | NOTICE of Local Rule 1.07(c) and Local Rule 3.02(a)(2)<br><br>–**Local Rule 1.07(c)** requires lead counsel to *promptly* file a **Notice of a Related Action** that identifies and describes any related action pending in the Middle District or elsewhere.<br><br>–**Local Rule 3.02(a)(2)** requires the parties in every civil proceeding, except those described in subsection (d), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies or employees. Judges may have a special CMR form for certain types of cases. These forms can be found at www.flmd.uscourts.gov under the Forms tab for each judge.<br><br>**(DAY) (Entered: 01/27/2023)** |
| 01/27/2023 | 6 | **ORDER re 2––motion for a preliminary injunction; directing Warner to file a proof of service no later than 2/10/2023; directing the school board to respond within seven days after receiving service of process and notice of the motion. Signed by Judge Steven D. Merryday on 1/27/2023. (WBW)** (Entered: 01/27/2023) |
| 01/27/2023 | 7 | RETURN of service executed on 01/26/23 by Blake A. Warner as to School Board of Hillsborough County, Florida. (AG) Modified text on 1/30/2023 (AG). (Entered: 01/30/2023) |
| 01/27/2023 | 8 | RETURN of service executed on 01/26/23 by Blake A. Warner as to School Board of Hillsborough County, Florida. (AG) (Entered: 01/30/2023) |
| 01/30/2023 | 9 | NOTICE of Corrected Filing and RESPONSE to Court's 6 Order, by Blake A. Warner. (Attachments: # 1 Revised Timeline Email)(AG) (Entered: 01/30/2023) |
| 01/30/2023 | 10 | NOTICE of a related action per Local Rule 1.07(c) by Blake A. Warner. Related case(s): No. (AG) (Entered: 01/30/2023) |
| 02/02/2023 | 11 | NOTICE of Appearance by Jason L. Margolin on behalf of School Board of Hillsborough County, Florida (Margolin, Jason) (Entered: 02/02/2023) |

| 02/02/2023 | 12 | MOTION for Extension of Time to File Response/Reply as to 2 MOTION for Preliminary Injunction by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 02/02/2023) |
|---|---|---|
| 02/02/2023 | 13 | **ENDORSED ORDER: The defendant's unopposed motion (Doc. 12) to extend the time within which to respond to the motion for a preliminary injunction is GRANTED. No later than FEBRUARY 6, 2023, the defendant must respond. Signed by Judge Steven D. Merryday on 2/2/2023. (WBW)** (Entered: 02/02/2023) |
| 02/06/2023 | 14 | MOTION to Dismiss Complaint or, in the Alternative, MOTION for a More Definite Statement by School Board of Hillsborough County, Florida. (Attachments: # 1 Exhibit A–Email Regarding Lawsuit Scope)(Margolin, Jason) . Added MOTION for More Definite Statement on 2/6/2023 (MCB). (Entered: 02/06/2023) |
| 02/06/2023 | 15 | RESPONSE in Opposition re 2 MOTION for Preliminary Injunction filed by School Board of Hillsborough County, Florida. (Attachments: # 1 Exhibit A–Email Regarding Lawsuit Scope)(Margolin, Jason) (Entered: 02/06/2023) |
| 02/06/2023 | 16 | RESPONSE to Motion re 14 MOTION to Dismiss Complaint *or, in the Alternative, for a More Definite Statement* MOTION for More Definite Statement filed by Blake A. Warner. (Attachments: # 1 Exhibit)(AG) (Entered: 02/07/2023) |
| 02/06/2023 | 17 | MOTION for Miscellaneous Relief, specifically for leave to file documents in the Middle District of Florida using the docketing system by Blake A. Warner. (AG) (Entered: 02/07/2023) |
| 02/07/2023 | 18 | MOTION to Amend 2 MOTION for Preliminary Injunction, or in the alternative, MOTION for Leave to File Reply to Defendant's Response in Opposition to Plaintiff's Motion for Prelimianry Injunction by Blake A. Warner. (AG) Modified text on 2/8/2023 (AG). (Entered: 02/08/2023) |
| 02/09/2023 | 19 | **ORDER granting 17––motion to file documents using electronic filing system; permitting Warner to register for CM/ECF not later than 2/17/2023; directing Warner to read and comply with all applicable rules. Signed by Judge Steven D. Merryday on 2/9/2023. (WBW)** (Entered: 02/09/2023) |
| 02/09/2023 | 20 | MOTION to Withdraw 2 MOTION for Preliminary Injunction by Blake A. Warner. (Attachments: # 1 Exhibit)(AG) (Entered: 02/10/2023) |
| 02/11/2023 | 21 | NOTICE by Blake Andrew Warner re 20 MOTION to Withdraw 2 MOTION for Preliminary Injunction *Defendant is UNOPPOSED* (Attachments: # 1 Exhibit Boundary Plan, Davis recommends (phases))(Warner, Blake) (Entered: 02/11/2023) |
| 02/13/2023 | 22 | **ORDER granting 20––motion to withdraw motion for preliminary injunction; striking and directing the clerk to terminate 2––motion for a preliminary injunction; denying as moot 18––motion to amend. Signed by Judge Steven D. Merryday on 2/13/2023. (WBW)** (Entered: 02/13/2023) |
| 04/07/2023 | 23 | **ENDORSED ORDER: A hearing on the motion (Doc. 14) to dismiss is SCHEDULED for APRIL 28, 2023, at 10:00 A.M. in Courtroom 15A, United States Courthouse, 801 North Florida Avenue, Tampa, Florida. Blake Warner, who proceeds pro se, and lead counsel for the defendant must appear in person. Signed by Judge Steven D. Merryday on 4/7/2023. (WBW)** (Entered: 04/07/2023) |
| 04/28/2023 | 24 | Minute Entry. In Person Proceedings held before Judge Steven D. Merryday: MOTION HEARING held on 4/28/2023 re 14 MOTION to Dismiss Complaint *or, in the Alternative, for a More Definite Statement* MOTION for More Definite Statement filed by School Board of Hillsborough County, Florida. Court Reporter: David Collier (DAY) (Entered: 04/28/2023) |
| 04/28/2023 | 25 | **ORDER denying 14––motion to dismiss; denying 14––motion for more definite statement; directing the School Board to answer the complaint no later than MAY 19, 2023. Signed by Judge Steven D. Merryday on 4/28/2023. (WBW)** (Entered: 04/28/2023) |
| 05/10/2023 | 26 | NOTICE of a related action per Local Rule 1.07(c) by Blake Andrew Warner. Related case(s): Yes (Attachments: # 1 Exhibit Related Complaint)(Warner, Blake) (Entered: 05/10/2023) |

| 05/17/2023 | 27 | MOTION to Consolidate Cases by Blake Andrew Warner. (Attachments: # 1 Exhibit email requesting conference)(Warner, Blake) (Entered: 05/17/2023) |
|---|---|---|
| 05/18/2023 | 28 | NOTICE by Blake Andrew Warner re 1 Complaint, *of Abandonment of Claims I and II* (Warner, Blake) (Entered: 05/18/2023) |
| 05/18/2023 | 29 | AMENDED COMPLAINT against School Board of Hillsborough County, Florida filed by Blake Andrew Warner. (Attachments: # 1 Exhibit south tampa race map, # 2 Exhibit white map, # 3 Exhibit hispanic map, # 4 Exhibit black map, # 5 Exhibit south tampa elementary map, # 6 Exhibit email consent amend)(Warner, Blake) (Entered: 05/18/2023) |
| 05/30/2023 | 30 | ANSWER and affirmative defenses to 29 Amended Complaint, by School Board of Hillsborough County, Florida. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Margolin, Jason) (Entered: 05/30/2023) |
| 05/31/2023 | 31 | NOTICE informing the parties that they may consent to the jurisdiction of a United States magistrate judge by filing Form AO 85 Notice, Consent, and Reference of a Civil Action to a Magistrate Judge using the event **Consent to Jurisdiction of US Magistrate Judge**. (Signed by Deputy Clerk). (DAY) (Entered: 05/31/2023) |
| 06/13/2023 | 32 | MOTION to Strike 30 Answer to amended complaint by Blake Andrew Warner. (Attachments: # 1 Exhibit United States Statement of Interest)(Warner, Blake) (Entered: 06/13/2023) |
| 06/23/2023 | 33 | RESPONSE to Motion re 32 MOTION to Strike 30 Answer to amended complaint filed by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 06/23/2023) |
| 06/23/2023 | 34 | MOTION for Judgment on the Pleadings by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 06/23/2023) |
| 06/27/2023 | 35 | RESPONSE in Opposition re 34 MOTION for Judgment on the Pleadings filed by Blake Andrew Warner. (Warner, Blake) (Entered: 06/27/2023) |
| 06/29/2023 | 36 | CASE MANAGEMENT REPORT. (Margolin, Jason) (Entered: 06/29/2023) |
| 07/06/2023 | 37 | **COPY OF ORDER dismissing complaint in case 8:23–cv–01029–SDM–SPF, allowing plaintiff to amend. Signed by Judge Steven D. Merryday on 7/6/2023. (LAB)** (Entered: 07/06/2023) |
| 07/10/2023 | 38 | SECOND AMENDED COMPLAINT against School Board of Hillsborough County, Florida filed by Blake Andrew Warner. (Attachments: # 1 Exhibit A south tampa race map, # 2 Exhibit B white map, # 3 Exhibit C hispanic map, # 4 Exhibit D black map, # 5 Exhibit E south tampa elementary map, # 6 Exhibit F wfla addison davis property values, # 7 Exhibit G HOLC ads, # 8 Exhibit H HOLC map, # 9 Exhibit J carrollwood proposal, # 10 Exhibit K wtsp property value concerns, # 11 Exhibit R district map, # 12 Exhibit X gerrymander graphs elementary, # 13 Exhibit Y gerrymander graphs middle, # 14 Exhibit Z gerrymander graphs high)(Warner, Blake) Modified text on 7/11/2023 (LNR). (Entered: 07/10/2023) |
| 07/11/2023 | 39 | **ORDER denying as moot 32––motion to strike; denying as moot 34––motion for judgment on the pleadings; denying as moot 27––motion to consolidate actions; directing the clerk to remove from the case caption "On behalf of himself and his minor child J.W." Signed by Judge Steven D. Merryday on 7/11/2023. (WBW)** (Entered: 07/11/2023) |
| 07/13/2023 | 40 | MOTION for Preliminary Injunction by Blake Andrew Warner. (Attachments: # 1 Text of Proposed Order proposed order, # 2 Exhibit A – Distance Carrollwood K–8, # 3 Exhibit B – Distance Adams MS, # 4 Exhibit E – Carrollwood proposal, # 5 Exhibit F – School Race demographics, # 6 Exhibit G – State school grades, # 7 Exhibit M – WFLA addison davis property values, # 8 Exhibit N – Distant assigned students, # 9 Exhibit K – Assignment, # 10 Exhibit Q – Race Map)(Warner, Blake) (Entered: 07/13/2023) |
| 07/20/2023 | 41 | RESPONSE in Opposition re 40 MOTION for Preliminary Injunction filed by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 07/20/2023) |

| 07/21/2023 | 42 | NOTICE OF INTERLOCUTORY APPEAL as to 37 Order by Blake Andrew Warner. (Warner, Blake) (Entered: 07/21/2023) |
|---|---|---|
| 07/21/2023 | 43 | TRANSMITTAL of initial appeal package to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 42 Notice of Interlocutory Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (LD) (Entered: 07/21/2023) |
| 07/23/2023 | 44 | Unopposed MOTION for Leave to File Other Document :Reply to Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction by Blake Andrew Warner. (Warner, Blake) (Entered: 07/23/2023) |
| 07/24/2023 | 45 | MOTION to Dismiss Plaintiff's Second Amended Complaint by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 07/24/2023) |
| 07/26/2023 | 46 | Unopposed MOTION to File Excess Pages by Blake Andrew Warner. (Warner, Blake) (Entered: 07/26/2023) |
| 07/27/2023 | 47 | **ORDER granting 44–motion to reply in support of the motion for a preliminary injunction; permitting Warner to reply in a paper not exceeding SEVEN pages; granting–in–part 46–motion to file excess pages in the response to the motion to dismiss; permitting Warner to respond in a paper not exceeding THIRTY pages. Signed by Judge Steven D. Merryday on 7/27/2023. (WBW)** (Entered: 07/27/2023) |
| 07/28/2023 | 48 | Joint MOTION for leave to file DOCUMENT under seal by School Board of Hillsborough County, Florida (Margolin, Jason).Motions referred to Magistrate Judge Julie S. Sneed. (Entered: 07/28/2023) |
| 07/31/2023 | 49 | RESPONSE in Opposition re 45 MOTION to Dismiss Plaintiff's Second Amended Complaint filed by Blake Andrew Warner. (Warner, Blake) (Entered: 07/31/2023) |
| 07/31/2023 | 50 | REPLY to Response to Motion re 40 MOTION for Preliminary Injunction filed by Blake Andrew Warner. (Warner, Blake) (Entered: 07/31/2023) |
| 08/15/2023 | 51 | USCA ORDER: Pursuant to the 11th Cir. R. 42–1(b), this appeal is DISMISSED for want of prosecution because the appellant Blake Warner failed to pay the filing and docketing fees to the district court, or alternatively, file a motion to proceed in forma pauperis in district court and file a Transcript Order Form within the time fixed by the rules as to 42 Notice of Interlocutory Appeal. EOD: 08/15/2023; USCA number: 23–12408–E. (AG) (Entered: 08/16/2023) |
| 08/16/2023 | | USCA appeal fees received $505.00, receipt number TPA69027 re 42 Notice of Interlocutory Appeal filed by Blake Andrew Warner. (AA) (Entered: 08/16/2023) |
| 08/16/2023 | 52 | TRANSCRIPT information form filed by Blake Andrew Warner for proceedings held on April 28, 2023 before Judge Merryday re 42 Notice of Interlocutory Appeal. USCA number: 23–12408. Electronic notification sent to Court Reporter David Collier (Warner, Blake) (Entered: 08/16/2023) |
| 08/17/2023 | 53 | USCA ORDER: Motion to reinstate appeal filed by Appellant Blake Warner is GRANTED by clerk as to 42 Notice of Interlocutory Appeal. EOD: 08/17/2023; USCA number: 23–12408–E. (AG) (Entered: 08/17/2023) |
| 08/25/2023 | 54 | **ORDER granting 48–motion for leave to file under seal. Signed by Judge Steven D. Merryday on 8/25/2023. (WBW)** (Entered: 08/25/2023) |
| 08/31/2023 | 55 | **ENDORSED ORDER: The motion (Doc. 40) for a preliminary injunction and the motion (Doc. 45) to dismiss are REFERRED to the magistrate judge to conduct any necessary hearing and to submit a report and recommendation. Signed by Judge Steven D. Merryday on 8/31/2023. (WBW) Motions referred to Magistrate Judge Julie S. Sneed.** (Entered: 08/31/2023) |
| 08/31/2023 | 56 | NOTICE of hearing: re: 40 MOTION for Preliminary Injunction , 45 MOTION to Dismiss Plaintiff's Second Amended Complaint EVIDENTIARY Hearing set for 9/19/2023 at 02:00 PM in Tampa Courtroom 11 A before Magistrate Judge Julie S. Sneed. MOTION Hearing set for 9/19/2023 at 02:00 PM in Tampa Courtroom 11 A before Magistrate Judge Julie S. Sneed. (SET) (Entered: 08/31/2023) |

| | | |
|---|---|---|
| 09/01/2023 | 57 | NOTICE OF RESCHEDULING HEARING: The EVIDENTIARY Hearing and Motion Hearing previously scheduled for 9/19/2023 is rescheduled. New scheduling date and time: Evidentiary Hearing set for 10/26/2023 at 10:00 AM before Magistrate Judge Julie S. Sneed. Motion Hearing set for 10/26/2023 at 10:00 AM before Magistrate Judge Julie S. Sneed. (SET) (Entered: 09/01/2023) |
| 09/06/2023 | 58 | COURT REPORTER ACKNOWLEDGMENT by David J. Collier re 42 Notice of Interlocutory Appeal. Estimated transcript filing date: 9–1–2023. USCA number: 23–12408–E. (DJC) (Entered: 09/06/2023) |
| 09/06/2023 | 59 | TRANSCRIPT of motion hearing held on April 28, 2023 before District Judge Steven D. Merryday re 42 Notice of Interlocutory Appeal. Court Reporter: David J. Collier. Email address: david_collier@flmd.uscourts.gov. Telephone number: (813) 301–5575. NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter Redaction Request due 9/27/2023. Redacted Transcript Deadline set for 10/10/2023. Release of Transcript Restriction set for 12/5/2023. (DJC) (Entered: 09/06/2023) |
| 09/06/2023 | 60 | NOTIFICATION that transcript has been filed by David J. Collier re: 42 Notice of Interlocutory Appeal. USCA number: 23–12408–E. (DJC) (Entered: 09/06/2023) |
| 09/15/2023 | 61 | MOTION for Issuance of Subpoena *Addison Davis* by Blake Andrew Warner. (Warner, Blake) Motions referred to Magistrate Judge Julie S. Sneed. Modified on 9/25/2023 to terminate as pending motion. Incorrect event used. Counsel notified. (AG) (Entered: 09/15/2023) |
| 09/26/2023 | 62 | Joint MOTION to Bifurcate *Hearing* by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 09/26/2023) |
| 09/27/2023 | 63 | **ENDORSED ORDER granting the parties' 62 Joint Motion to Bifurcate Hearing. The evidentiary hearing scheduled for October 26, 2023 is continued and the Clerk is directed to re–notice the hearing as a motion hearing on Defendant's 45 Motion to Dismiss only. The evidentiary hearing on Plaintiff's 40 Motion for a Preliminary Injunction will be reset by separate notice. Signed by Magistrate Judge Julie S. Sneed on September 27, 2023. (DD)** (Entered: 09/27/2023) |
| 09/28/2023 | 64 | NOTICE canceling Evidentiary Hearing scheduled for 10/26/2023 at 10:00 AM. The Motion Hearing on Defendant's 45 Motion to Dismiss will proceed as previously scheduled on 10/26/2023 at 10:00 AM in Tampa Courtroom 11 A before Magistrate Judge Julie S. Sneed. (SET) (Entered: 09/28/2023) |
| 10/16/2023 | 65 | NOTICE of supplemental authority re 49 Response in Opposition to Motion *Ga. State Conference of NAACP v. City of Lagrange (11th Cir. 2019)* by Blake Andrew Warner. (Warner, Blake) (Entered: 10/16/2023) |
| 10/26/2023 | 66 | Minute Entry. In Person Proceedings held before Magistrate Judge Julie S. Sneed: MOTION HEARING held on 10/26/2023 re 45 MOTION to Dismiss Plaintiff's Second Amended Complaint filed by School Board of Hillsborough County, Florida. (Digital) (SET) (Entered: 10/26/2023) |

# Doc. 1

FILED

# United States District Court
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT FLORIDA
TAMPA, FLORIDA

BLAKE WARNER, J.W.

v.

THE SCHOOL BOARD OF
HILLSBOROUGH COUNTY FLORIDA

Case Number  8: 23 cv 181 SDM - JSS

## VERIFIED COMPLAINT

## INTRODUCTION

*Plaintiff*, Blake Warner, *pro se*, hereby brings this action, on behalf of himself and his minor child J.W., against The School Board of Hillsborough County, Florida ("HCSB") for violations of 20 U.S. Code § 1706 ("Equal Educational Opportunities Act") or ("EEOA"), 42 U.S. Code § 3601 et seq ("Fair Housing Act"), and 42 U.S. Code § 1983, for intentionally operating a segregated school system.

The HCSB has significantly contributed to racial imbalance in the Hillsborough County housing market by drawing boundaries around racial lines. The HCSB then used these racial boundaries as a pretext for discrimination through redlining and steering.



1

An interactive version of the map boundaries presented are available at: https://grandwizarddavis.de/

## Plaintiffs

1. *Plaintiff* Blake Warner is African-American and the parent of a minor child ( J.W.) who currently attends a public school operated by the HCSB.

2. Blake Warner and J.W. have continuously resided in Hillsborough County since 2016.

3. At all times relevant to this lawsuit, J.W. was assigned to the following schools operated by the HCSB: Plant High School, Chamberlain High School, Wilson Middle School, Coleman Middle School, Adams Middle School, Mitchell Elementary, and Lake Magdalene Elementary.

4. J.W. currently attends Mitchell Elementary, and intends to attend Coleman Middle School and Plant High School thereafter.

## Defendant HCSB

5. Defendant The School Board of Hillsborough County, Florida operates, controls and supervises all free public schools within Hillsborough County pursuant Art. IX § 4 and Fla. Stat. § 1001.42.

6. The HCSB accepts federal funds through the Individuals with Disabilities Education Act ("IDEA"), Title I-VII, and the Cares Act.

## Jurisdiction and Venue

7. This court has jurisdiction pursuant 20 U.S. Code § 1706, 42 U.S. Code § 3613, and 42 U.S. Code § 1983.

8. Venue is proper pursuant 28 U.S.C. § 1391 with respect to all defendants, because all Defendants reside in the Middle District of Florida, and all events giving rise to *Plaintiff*'s claims occurred in the Middle District of Florida.

# EEOA

9. The EEOA declares unlawful segregation as "the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student".

10. When J.W. lived at 502 S. Fremont Avenue during the 2019 school year, he was assigned to Mitchell Elementary despite being closer to Gorrie Elementary, and he was assigned to Plant High School despite being closer to Blake High School. This assignment resulted in more segregation than would have normally occurred had he been assigned to the closest schools.

11. As laid out below, the HCSB has a pattern and/or practice of assigning students to farther away schools resulting in more segregation, in violation of the EEOA.

## TAMPA REGIONS

12. For the purposes of this complaint, the following regions are defined as follows:

13. *South of Gandy* ("SOG") is defined as the area between Mac Dill Air Force Base and Gandy Boulevard.

14. *South Tampa* is defined as the area between Gandy Boulevard and Kennedy Boulevard.

15. *West Tampa* is defined as the area between Kennedy Boulevard and Busch Boulevard/Linebaugh Avenue, and west of I-275.

16. *North Tampa* is defined as the area between Busch Boulevard/Linebaugh Avenue and Lutz, Forida, and west of I-275.

17. *East Tampa* is defined as the area between Kennedy Boulevard and Fletcher Avenue, and east of I-275.

## REGIONS

18. *South Tampa*'s population is predominantly White. *see* Exhibits A and B.

19. *West Tampa*'s population is predominantly Hispanic. *see* Exhibits A and C.

20. *East Tampa*'s population is predominantly African-American. *see* Exhibits A and D.

21. The racial demographics rapidly change at Kennedy Boulevard. Kennedy is generally the demarcation point between affluent whites and minorities.

## ELEMENTARY SCHOOLS

22. The three *South Tampa* elementary schools which border *West Tampa*–Grady, Mitchell, and Gorrie–currently have utilization rates of 118%, 111%, and 107%, respectively. *see* Exhibits E.

23. The three *West Tampa* elementary schools which border *South Tampa*–Tampa Bay Boulevard, West Tampa, and Just–currently have utilization rates of 63%, 84%, and 41%, respectively. *see* Exhibits E.

24. The bordering *South Tampa* schools are extremely over utilized, while the bordering *West Tampa* are extremely underutilized.

25. The obvious solution is to shift the school boundaries southward, sending some of the white students from over-utilized *South Tampa* to underutilized–majority minority–*West Tampa* to balance out the utilization.

26. Rather than do this, the HCSB has proposals to close a minority school and leave the bordering *South Tampa* schools at a staggering 100-119% utilization despite their stated goal to reduce utilization to the 80% range.

27. The HCSB will not lower those utilization rates to the 80% range, because that would mean sending white students to bordering minority schools.

## Plant, Jefferson, and Blake High School

28. The following map shows the locations and boundaries for Plant High School (orange), Jefferson High School (yellow), and Blake High School (purple):



29. Plant High School is nearly *twice* as far from Davis Island as Blake High School is by ground transportation, yet students in that affluent white enclave are not assigned to Blake, a predominently African-American school.

30. Similarly, the neighborhoods of Westshore Palms, North Bon Air, Beach Park, and Oakford Park are at least twice as close to Jefferson High School than Plant, and in some cases literally across the street from Jefferson, yet those white students are assigned to Plant and the school district is unable to give a cognizable reason why.

31. The reason for the odd shape of the boundaries becomes clear when you overlay those boundaries over a map of the racial demographics, as illustrated in the

following image:



32. The most egregious part is that Plant is overpopulated, and yet they still will not send those white students to predominantly minority Jefferson High School and Blake High School.

33. The following image shows just how maladjusted the current Plant High School boundaries are, when overlaid with the boundaries for the closest high schools. The shaded area highlight portions of Plant High School's current boundary that are closer to Jefferson High School and Blake High School:



# Coleman, Madison, and Pierce Middle School

34. The situation with Coleman Middle School is similar to Plant High School: Coleman's boundary is artificially kept lower to exclude assigning the large African-

American population to their north, despite them being significantly closer to Coleman than Pierce.

35. Madison to the South of Coleman, is exerting pressure to move Coleman's boundaries up. But to avoid doing this, the District is proposing plans to just close Madison or Monroe, to avoid sending white students to minority schools to the north.

36. The following image shows the locations of Coleman, Pierce, and Madison, overlayed over a map of race. The black lines represent the border for the closest school:



## DISTRICT BOUNDARIES

37. Not only did the school board segregate the students, they segregated themselves. They drew district map boundaries that correspond directly to race: the Hispanic population is almost exclusively located in district 1, the African-American population in district 5, and white population in district 2.

38. This image shows the racial map overlaid with the district boundaries shown in blue lines:



39. The racial segregation in the district map was intentional.

40. The HCSB stated "Given the population distribution in Hillsborough County, having a high black population in District Five maximizes the opportunity for a minority candidate to be elected. When considering the demographic profile of each map, any map that identified a significant reduction in the black population in District Five was discarded"[1].

41. The HCSB stated "The black population percentage for district five .. is 41.1%"[2].

42. The black population percentage for Hillsborough County is approximately 18%.

43. The school board intentionally drew their district map to concentrate their black population in District 5.

44. By concentrating the black population in District 5, they remove the black population from the other districts causing other races to be segregated as well. The end result was a map where Hispanic (District 1), black (District 5), and white (District 2, 3, and 4) populations were segregated into their own respective districts.

## FAIR HOUSING ACT

45. Hillsborough County home buyers and renters frequently make decisions on which neighborhoods to purchase or rent based substantially on the public schools that are assigned to properties.

46. The assigned schools are provisioned services and/or facilities in connection with the residence that is assigned to them.

47. The HCSB is the entity who assigns public schools to specific residences, usually through the promulgation of a boundary map.

---

[1] *see* https://www.hillsboroughschools.org/cms/lib/FL50000635/Centricity/Domain/282/Map%20F.png
[2] *see* https://www.hillsboroughschools.org/cms/lib/FL50000635/Centricity/Domain/282/Map%20F.png

48. Promulgating school boundary maps that unlawfully segregate by race under the EEOA is de facto racial discrimination under the Fair Housing Act.

49. At all times relevant, there has been at least one residential real estate property for sale in each of the affected neighborhoods.

50. "Steering" is the practice of influencing a buyer's choice of communities based upon one of the protected characteristics under the Fair Housing Act, which are race, color, religion, gender, disability, familial status, or national origin.

51. "Redlining" is a discriminatory practice that puts services (financial and otherwise) out of reach for residents of certain areas based on race or ethnicity, often times by drawing lines on maps.

52. The HCSB artificially inflated the property values in *South Tampa* by racially segregating white students into white schools to fabricate "A-rated" schools by excluding minority students.

53. On the flip side, this caused the schools that were deprived of those white students to get less resources and lower school grades, which depressed property values in homes assigned to those manufactured minority schools.

54. This pricing imbalance steered minorities to minority neighborhoods that they could only afford due to HCSB segregation based pricing manipulation, and affluent white people to the segregated white neighborhoods, further entrenching the segregation.  Effectively redlining along the HCSB's segregated school boundaries.

## Injury

55. As an African-American who has been the subject of discrimination throughout his life, Mr. Warner is particularly sensitive to discriminatory practices.  Mr. Warner was insulted and emotionally distressed by the knowledge that school

aged students in his community–including his child–were being discriminated against because of their race... in the year 2023.

56. Mr. Warner was and is saddened, angered, and insulted by the fact that the HCSB continues to operate a segregated school system.

57. Defendant's unlawful conduct proximately caused Mr. Warner to suffer the afore-mentioned emotions, which have manifested into stress, unpleasant rumination, mental strain, and feelings of indignity, hopelessness and anxiety about race discrimination in housing and the school system.

58. Due to HCSB's manipulation of property values, Mr. Warner and J.W. were priced out *South Tampa* and had to relocate to more diverse *North Tampa*, further increasing segregation in *South Tampa* and resulting in a loss of community for both Mr. Warner and J.W.

59. Mr. Warner grew up in *South Tampa* and *SOG*. He attended elementary, middle, and high school there. J.W. had lived half of his life there.

60. J.W. is injured by currently attending schools which are unlawfully segregated, depriving him of both an equal educational opportunity and the opportunity to attend racially integrated schools.

## INTENT

61. The fact that the school boundaries correlate nearly 1-to-1 directly to race.

62. The fact that the school board explicitly used race to draw the district maps to segregate.

63. The fact that the HCSB has a history of refusing to desegregate.

64. The fact that the HCSB was notified several times that they were in violation of the EEOA, and provided racial maps and other evidence in support of that

assertion, yet the HCSB ignored it and pressed forward with racial segregated maps and proposals.

65. The fact that Blake High School was the negro High School in the 50's before desegregation, and it remains a segregated negro High School in 2023 due to the obvious gerrymandering of Blake High School.

66. The fact that white students across the street from Jefferson High School are not assigned to Jefferson High School.

67. The affluent white residents of *South Tampa* wield tremendous political influence in relation to the other parts of Hillsborough County.

68. Those affluent white *South Tampa* residents are currently exerting tremendous pressure on the HCSB to not implement certain proposed school boundary changes that would assign some of their homes to Jefferson High School, despite their homes being geographically closer to Jefferson, because generally they do not want their children attending Jefferson High School (a low performing minority school) and because their property values will drop if their homes are reassigned from A-rated Plant High School to C-rated Jefferson High School.

69. Superintendent Addison Davis has capitulated to this political pressure, and has expressed assurances to certain school board members that he will not submit the proposal that reassigns white students to Jefferson High School, while publicly stating that no decision has been made:



**Tim McGaughey** Author  Group expert
There was a question about where the superintendent stands on this so far. Dr. Hahn commented that there was a soft commitment to keep the 130 families in the district.

Note: I assume this referenced scenario 2 and WBA, WSP.

1d                                                                    3

70. The school board members are poised to approve yet another racially segregated map, despite knowing full and well that those maps are racially segregated, because they lack the political courage to overcome that political pressure from *South Tampa* residents:



71. School Board Member Dr. Stacy Hahn's comments about "fighting everyday" to keep District 2 (white) family's in District 2 schools (white).

72. A discriminatory purpose, not any legitimate reason, was a motivating factor behind Defendant's aforementioned discriminatory actions and/or omissions.

## Dr. Hahn's Statements

73. On or about January 11, 2023, Dr. Stacy Hahn gave a news interview with New Channel 8 WFLA[3].

74. This interview was broadcast on public television as well as printed on WFLA's website.

75. Dr. Hahn knew when she agreed to this interview, that it would be published and/or printed on television and/or the WFLA website.

76. During this interview, Dr. Hahn stated "I can tell you that I am fighting every day to make sure District 2 families stay in District 2 schools,".

77. There is no legal basis for District 2 families to stay in District 2. School boundaries routinely cross those arbitrary Districts, whose sole purpose is for electing school board members, not for school boundaries.

78. "District 2" is the racially gerrymandered Caucasian district that Dr. Hahn represents. "District 2"'s population is predominantly white.

79. District 1's population is predominantly minority and borders District 2 to the north.

80. Dr. Hahn's statement is dog whistling, telling white residents in South Tampa that she is fighting hard not to send their white children to a minority dominated schools in District 1.

81. Dr. Hahn's statement indicates a preference for white people to live and attend white schools in District 2, and consequently for minority students to attend schools in District 1.

---

[3] *see* https://www.wfla.com/news/hillsborough-county/hundreds-attend-plant-high-school-meeting-to-protest-proposed-hillsborough-school-redistricting/

## DISPARATE IMPACT

82. The current school boundaries are arbitrary and the HCSB cannot have any legitimate objective for them because they violate the EEOA.

83. The current school boundaries disproportionately affect racial minorities by isolating them into under-performing schools, while the isolated white students excel in A-Rated schools.

84. The disparity is immense, every single one of the *South Tampa* white schools near the border are A-Rated, and every single one of the minority schools near the *South Tampa* border are C rated or below. The minority schools are so underfunded, that they cannot even afford to bus all of their students to extra circular activities such as football games. Meanwhile the white schools are swimming in cash.

85. While on paper both white schools and minority schools receive the same funding, in practice the white schools leverage the wealth of the affluent white parents to raise side-money for the school.

86. They raise hundreds of thousands of dollars per year in additional funding through fundraisers such as art galleries and other special events throughout the year.

87. The parents in the minority schools cannot afford to spend thousands of extra money out of pocket to self-fund their schools.

88. The end result is the white schools getting significant more funding than minority schools, leading to better student outcomes for white students.

89. The school boundaries are then directly used both to keep minority students out of the A-rated white schools so that they cannot benefit from this increased revenue and educational opportunity, and to avoid sending affluent white students to minority schools thus depriving those schools of an additional revenue stream and improving the ratings and educational opportunities at those schools.

90. This further harms the minority communities, because their property values are decreased, while the property values increase in the white neighborhoods.

# COUNTS

## COUNT I
### 20 U.S. Code § 1703(a): Deliberate Segregation
### J.W. Against DEFENDANT HCSB

91. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 90 *Defendant* intentionally segregated students by race by assigning them to farther away schools to increase segregation.

## COUNT II
### 20 U.S. Code § 1703(c): Closest School
### J.W. Against DEFENDANT HCSB

92. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 90 *Defendant* segregated students by race by assigning them to farther away schools which resulted in an increase in segregation.

## COUNT III
### 42 U.S. Code § 1983: Equal Protections - Race
### Blake Warner and J.W. Against DEFENDANT HCSB

93. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 90

94. *Defendant* intentionally treated white students differently than minority students, to segregate them.

## COUNT IV

*42 U.S. Code § 3604(b): Intentional Discrimination School Services*
*Blake Warner and J.W. Against* DEFENDANT *HCSB*

95. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 90

96. *Defendant* intended to segregate students by race and/or color through school assignment boundary maps which are the terms, conditions, or privileges of a sale or rental of a dwelling, or the provision of services or facilities in connection therewith.

## COUNT V

*42 U.S. Code § 3604(b): Disparate Impact School Services*
*Blake Warner and J.W. Against* DEFENDANT *HCSB*

97. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 90

98. *Defendant*'s school assignment boundary maps had a discriminatory effect on minority students in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race and/or color.

## NATURE OF RELIEF

WHEREFORE, *Plaintiffs* respectfully requests that this court:

(a) declare the actions, omissions, policies, and procedures of Defendant HCSB, complained of herein to be in violation of the Fair Housing Act; and

(b) declare the actions, omissions, policies, and procedures of Defendant HCSB, complained of herein to be in violation of the EEOA; and

(c) declare the actions, omissions, policies, and procedures of Defendant HCSB, complained of herein to be in violation of the equal protections clause; and

(d) enter a permanent injunction enjoining Defendant HCSB from promulgating any school assignment boundary maps that unlawfully segregate students by race; and

(e) enter a permanent injunction enjoining Defendant HCSB from promulgating any school assignment boundary maps without prior approval of the Court; and

(f) enter an order directing Defendant HCSB to submit a proposed desegregated school assignment boundary map for approval; and

(g) award to the *Plaintiff* costs of suit and reasonable attorney fees; and

(h) grant whatever additional relief this Court deems appropriate and just under the circumstances.

# DEMAND FOR BENCH TRIAL

Plaintiff hereby demands a trial by judge on all issues.

# UNSWORN DECLARATION

I declare under penalty of perjury that the foregoing is true and correct. Executed on:

| | |
|---|---|
| 1-26-2023 | |
| Date | Signature |
| | Blake Warner, *pro se* |
| | 2211 S. Village Ave |
| | Tampa, FL 33612 |
| | E-Service: BLAKE@NULL3D.COM |

# Doc. 29

# United States District Court
### FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

BLAKE WARNER

v.

THE SCHOOL BOARD OF
HILLSBOROUGH COUNTY FLORIDA

Case Number 8:23-CV-181-SDM-JSS

## AMENDED VERIFIED COMPLAINT

## INTRODUCTION

*Plaintiff*, Blake Warner, *pro se*, hereby amends his complaint, pursuant Rule 15(a)(2) with written consent of *Defendant*[1], against The School Board of Hillsborough County, Florida ("HCSB") for violations of 42 U.S. Code § 3601 et seq ("Fair Housing Act") for unlawful manipulation of housing values in *south tampa* by intentionally operating a segregated school system.

The HCSB has significantly contributed to racial imbalance in the Hillsborough County housing market by drawing boundaries around racial lines. The HCSB then used these racial boundaries as a pretext for discrimination through redlining and steering.

---

[1] *see* exhibit h. Though *Defendant* requests *Plaintiff* file a Rule 41 notice of dismissal for the individual counts, the eleventh circuit held that Rule 15 amendment is the proper procedure to do this, not Rule 41. *see* Perry v. Schumacher Group of Louisiana, 2018 WL 2473721 (11th Cir. June 4, 2018). *Plaintiff* construes this as written consent to amend.

An interactive version of the map boundaries presented are available at: https://grandwizarddavis.de/

## Plaintiff

1. *Plaintiff* is African-American.

2. *Plaintiff* has continuously resided in Hillsborough County since 2016.

## Defendant HCSB

3. Defendant The School Board of Hillsborough County, Florida operates, controls and supervises all free public schools within Hillsborough County pursuant Art. IX § 4 and Fla. Stat. § 1001.42.

4. The HCSB accepts federal funds through the Individuals with Disabilities Education Act ("IDEA"), Title I-VII, and the Cares Act.

## Jurisdiction and Venue

5. This court has jurisdiction pursuant 42 U.S. Code § 3613.

6. Venue is proper pursuant 28 U.S.C. § 1391 because *Defendant* reside in the Middle District of Florida, and all events giving rise to *Plaintiff*'s claims occurred in the Middle District of Florida.

## EEOA

7. The EEOA declares unlawful segregation as "the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within

the school district of such agency providing the appropriate grade level and type of education for such student".

8. As laid out below, the HCSB has a pattern and/or practice of assigning students to farther away schools resulting in more segregation.

## TAMPA REGIONS

9. For the purposes of this complaint, the following regions are defined as follows:

10. *South Tampa* is defined as the area between Gandy Boulevard and Kennedy Boulevard.

11. *West Tampa* is defined as the area between Kennedy Boulevard and Busch Boulevard/Linebaugh Avenue, and west of I-275.

12. *East Tampa* is defined as the area between Kennedy Boulevard and Fletcher Avenue, and east of I-275.

## REGIONS

13. *South Tampa*'s population is predominantly White. *see* Exhibits A and B.

14. *West Tampa*'s population is predominantly Hispanic. *see* Exhibits A and C.

15. *East Tampa*'s population is predominantly African-American. *see* Exhibits A and D.

16. The racial demographics rapidly change at Kennedy Boulevard. Kennedy is generally the demarcation point between affluent whites and minorities.

## ELEMENTARY SCHOOLS

17. The three *South Tampa* elementary schools which border *West Tampa*–Grady, Mitchell, and Gorrie–currently have utilization rates of 118%, 111%, and 107%, respectively. *see* Exhibits E.

18. The three *West Tampa* elementary schools which border *South Tampa*–Tampa Bay Boulevard, West Tampa, and Just–currently have utilization rates of 63%, 84%, and 41%, respectively. *see* Exhibits E.

19. The bordering *South Tampa* schools are extremely over utilized, while the bordering *West Tampa* are extremely underutilized.

20. The obvious solution is to shift the school boundaries southward, sending some of the white students from over-utilized *South Tampa* to underutilized–majority minority–*West Tampa* to balance out the utilization.

21. Rather than do this, the HCSB has proposals to close a minority school and leave the bordering *South Tampa* schools at a staggering 100-119% utilization despite their stated goal to reduce utilization to the 80% range.

22. The HCSB will not lower those utilization rates to the 80% range, because that would mean sending white students to bordering minority schools.

## PLANT, JEFFERSON, AND BLAKE HIGH SCHOOL

23. The following map shows the locations and boundaries for Plant High School (orange), Jefferson High School (yellow), and Blake High School (purple):



24. Plant High School is nearly *twice* as far from Davis Island as Blake High School is by ground transportation, yet students in that affluent white enclave are not assigned to Blake, a predominantly African-American school.

25. Similarly, the neighborhoods of Westshore Palms, North Bon Air, Beach Park, and Oakford Park are at least twice as close to Jefferson High School than Plant, and in some cases literally across the street from Jefferson, yet those white students are assigned to Plant and the school district is unable to give a cognizable reason why.

26. The reason for the odd shape of the boundaries becomes clear when you overlay those boundaries over a map of the racial demographics, as illustrated in the

following image:



27. The most egregious part is that Plant is overpopulated, and yet they still will not send those white students to predominantly minority Jefferson High School and Blake High School.

28. The following image shows just how maladjusted the current Plant High School boundaries are, when overlaid with the boundaries for the closest high schools. The shaded area highlight portions of Plant High School's current boundary that are closer to Jefferson High School and Blake High School:



## Coleman, Madison, and Pierce Middle School

29. The situation with Coleman Middle School is similar to Plant High School: Coleman's boundary is artificially kept lower to exclude assigning the large African-

American population directly to their north, despite them being significantly closer to Coleman than Pierce.

30. Madison to the South of Coleman, is exerting pressure to move Coleman's boundaries up. But to avoid doing this, the District is proposing plans to just close Madison or Monroe, to avoid sending white students to minority schools directly to the north.

31. The following image shows the locations of Coleman, Pierce, and Madison, overlayed over a map of race. The black lines represent the border for the closest school:



## District Boundaries

32. Not only did the school board segregate the students, they segregated themselves. They drew district map boundaries that correspond directly to race: the Hispanic population is almost exclusively located in district 1, the African-American population in district 5, and white population in district 2.

33. This image shows the racial map overlaid with the district boundaries shown in blue lines:



34. The racial segregation in the district map was intentional.

35. The HCSB stated "Given the population distribution in Hillsborough County, having a high black population in District Five maximizes the opportunity for a minority candidate to be elected. When considering the demographic profile of each map, any map that identified a significant reduction in the black population in District Five was discarded"[2].

36. The HCSB stated "The black population percentage for district five .. is 41.1%"[3].

37. The black population percentage for Hillsborough County is approximately 18%.

38. The school board intentionally drew their district map to concentrate their black population in District 5.

39. By concentrating the black population in District 5, they remove the black population from the other districts causing other races to be segregated as well. The end result was a map where Hispanic (District 1), black (District 5), and white (District 2, 3, and 4) populations were segregated into their own respective districts.

## FAIR HOUSING ACT

40. Hillsborough County home buyers and renters frequently make decisions on which neighborhoods to purchase or rent based substantially on the public schools that are assigned to properties.

41. The assigned schools are provisioned services and/or facilities in connection with the residence that is assigned to them.

42. The HCSB is the entity who assigns public schools to specific residences, usually through the promulgation of a boundary map.

---

[2] *see* https://www.hillsboroughschools.org/cms/lib/FL50000635/Centricity/Domain/282/Map%20F.png
[3] *see* https://www.hillsboroughschools.org/cms/lib/FL50000635/Centricity/Domain/282/Map%20F.png

43. Promulgating school boundary maps that unlawfully segregate by race under the EEOA is de facto racial discrimination under the Fair Housing Act.

44. At all times relevant, there has been at least one residential real estate property for sale in each of the affected neighborhoods.

45. "Steering" is the practice of influencing a buyer's choice of communities based upon one of the protected characteristics under the Fair Housing Act, which are race, color, religion, gender, disability, familial status, or national origin.

46. "Redlining" is a discriminatory practice that puts services (financial and otherwise) out of reach for residents of certain areas based on race or ethnicity, often times by drawing lines on maps.

47. The HCSB artificially inflated the property values in *South Tampa* by racially segregating white students into white schools to fabricate "A-rated" schools by excluding minority students.

48. On the flip side, this caused the schools that were deprived of those white students to get less resources and lower school grades, which depressed property values in homes assigned to those manufactured minority schools.

49. This pricing imbalance steered minorities to minority neighborhoods that they could only afford due to HCSB segregation based pricing manipulation, and affluent white people to the segregated white neighborhoods, further entrenching the segregation. Effectively redlining along the HCSB's segregated school boundaries.

## INJURY

50. As an African-American who has been the subject of discrimination throughout his life, Mr. Warner is particularly sensitive to discriminatory practices. Mr. Warner was insulted and emotionally distressed by the knowledge that school

aged students in his community were being discriminated against because of their race... in the year 2023.

51. Mr. Warner was and is saddened, angered, and insulted by the fact that the HCSB continues to operate a segregated school system.

52. *Defendant*'s unlawful conduct proximately caused Mr. Warner to suffer the afore-mentioned emotions, which have manifested into stress, unpleasant rumination, mental strain, and feelings of indignity, hopelessness and anxiety about race discrimination in housing and the school system.

53. Due to HCSB's manipulation of property values, *Plaintiff* was priced out of *South Tampa* and had to relocate to relocate outside of *South Tampa*, further increasing segregation in *South Tampa* and resulting in a loss of community for *Plaintiff*.

54. Mr. Warner spent much of his childhood in *South Tampa*. He attended Tinker Elementary, Monroe Middle School, and Robinson High School there.

## Intent

55. The fact that the school boundaries correlate nearly 1-to-1 directly to race.

56. The fact that the school board explicitly used race to draw the district maps to segregate.

57. The fact that the HCSB has a history of refusing to desegregate.

58. The fact that the HCSB was notified several times that they were in violation of the EEOA, and provided racial maps and other evidence in support of that assertion, yet the HCSB ignored it and pressed forward with racial segregated maps and proposals.

59. The fact that Blake High School was the negro High School in the 50's before desegregation, and it remains a segregated negro High School in 2023 due to the obvious gerrymandering of Blake High School.

60. The fact that white students across the street from Jefferson High School are not assigned to Jefferson High School.

61. The affluent white residents of *South Tampa* wield tremendous political influence in relation to the other parts of Hillsborough County.

62. Those affluent white *South Tampa* residents are currently exerting tremendous pressure on the HCSB to not implement certain proposed school boundary changes that would assign some of their homes to Jefferson High School, despite their homes being geographically closer to Jefferson, because generally they do not want their children attending Jefferson High School (a low performing minority school) and because their property values will drop if their homes are reassigned from A-rated Plant High School to C-rated Jefferson High School.

63. Superintendent Addison Davis has capitulated to this political pressure, and has expressed assurances to certain school board members that he will not submit the proposal that reassigns white students to Jefferson High School, while publicly stating that no decision has been made:


**Tim McGaughey**  Author  Group expert
There was a question about where the superintendent stands on this so far. Dr. Hahn commented that there was a soft commitment to keep the 130 families in the district.

Note: I assume this referenced scenario 2 and WBA, WSP.

1d                                                                              👍❤ 3

64. The school board members are poised to approve yet another racially segregated map, despite knowing full and well that those maps are racially segregated, be-

cause they lack the political courage to overcome that political pressure from *South Tampa* residents:



65. School Board Member Dr. Stacy Hahn's comments about "fighting everyday" to keep District 2 (white) family's in District 2 schools (white).

66. A discriminatory purpose, not any legitimate reason, was a motivating factor behind Defendant's aforementioned discriminatory actions and/or omissions.

## Dr. Hahn's Statements

67. On or about January 11, 2023, Dr. Stacy Hahn gave a news interview with New Channel 8 WFLA[4].

68. This interview was broadcast on public television as well as printed on WFLA's website.

69. Dr. Hahn knew when she agreed to this interview, that it would be published and/or printed on television and/or the WFLA website.

70. During this interview, Dr. Hahn stated "I can tell you that I am fighting every day to make sure District 2 families stay in District 2 schools,".

71. There is no legal basis for District 2 families to stay in District 2. School boundaries routinely cross those arbitrary Districts, whose sole purpose is for electing school board members, not for school boundaries.

72. "District 2" is the racially gerrymandered Caucasian district that Dr. Hahn represents. "District 2"'s population is predominantly white.

73. District 1's population is predominantly minority and borders District 2 to the north.

74. Dr. Hahn's statement is dog whistling, telling white residents in South Tampa that she is fighting hard not to send their white children to a minority dominated schools in District 1.

75. Dr. Hahn's statement indicates a preference for white people to live and attend white schools in District 2, and consequently for minority students to attend schools in District 1.

---

[4] *see* https://www.wfla.com/news/hillsborough-county/hundreds-attend-plant-high-school-meeting-to-protest-proposed-hillsborough-school-redistricting/

# DISPARATE IMPACT

76. The current school boundaries are arbitrary and the HCSB cannot have any legitimate objective for them because they violate the EEOA.

77. The current school boundaries disproportionately affect racial minorities by isolating them into under-performing schools, while the isolated white students excel in A-Rated schools.

78. This further harms the minority communities in *east tampa* and *west tampa*, because their property values are decreased, while the property values increase in the white neighborhoods.

# COUNTS

## COUNT I
### 42 U.S. Code § 3604: Intentional Discrimination

79. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 78

80. *Defendant* intended to unlawfully segregate students by race and/or color through *south tampa* school assignment boundary maps which are the terms, conditions, or privileges of a sale or rental of a dwelling, or the provision of services or facilities in connection therewith; or otherwise made housing unavailable by pricing minorities out of *south tampa* due to unlawful pricing manipulation.

## COUNT II
### 42 U.S. Code § 3604: Disparate Impact

81. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 78

82. *Defendant*'s school assignment boundary maps had a discriminatory effect on minority students in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of *south tampa* services or facilities in connection therewith, because of race and/or color, or otherwise made housing unavailable by pricing minorities out of *south tampa* due to unlawful pricing manipulation.

## Nature of Relief

**Wherefore**, *Plaintiffs* respectfully requests that this court:

(a) declare the actions, omissions, policies, and procedures of Defendant HCSB, complained of herein to be in violation of the Fair Housing Act; and

(b) enter a permanent injunction enjoining Defendant HCSB from promulgating any school assignment boundary maps complained of herein that unlawfully segregate students by race; and

(c) enter a permanent injunction enjoining Defendant HCSB from promulgating any school assignment boundary maps complained of herein without prior approval of the Court; and

(d) enter an order directing Defendant HCSB to submit a proposed desegregated school assignment boundary map complained of herein for approval; and

(e) award to the *Plaintiff* costs of suit and reasonable attorney fees; and

(f) grant whatever additional relief this Court deems appropriate and just under the circumstances.

## DEMAND FOR BENCH TRIAL

Plaintiff hereby demands a trial by judge on all issues.

## UNSWORN DECLARATION

I declare under penalty of perjury that the foregoing is true and correct. Executed on:

_5-18-2023_
_____

Date

_____

Signature

Blake Warner, *pro se*

2211 S. Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM

17

# Doc. 30

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

BLAKE WARNER and J.W.,

     Plaintiffs,

v.                            Case No. 8:23-cv-00181-SDM-JSS

THE SCHOOL BOARD OF
HILLSBOROUGH COUNTY
FLORIDA,

     Defendant.

_____/

## ANSWER AND AFFIRMATIVE DEFENSES
## TO AMENDED VERIFIED COMPLAINT

Defendant School Board of Hillsborough County, Florida ("School Board"), answers the numbered paragraphs of the Amended Verified Complaint (Dkt. 29) (the "Amended Complaint") by Plaintiff Blake Warner ("Plaintiff")[1] and states:

The School Board denies any wrongdoing. The School Board denies all allegations by Plaintiff, except as specifically set forth below. Further, legal conclusions do not require a response; to the extent a response is required,

---

[1] In the original Complaint, Plaintiff included his minor child (J.W.) as a co-plaintiff. In light of the Amended Verified Complaint, the School Board understands that J.W. is no longer a party to this action. To the extent J.W. raises any allegations or claims in this action, they are denied.

70614833;1

Plaintiff's legal conclusions are denied. The School Board denies any allegations either express or implied in the headings, subheadings, and defined terms in this Answer. The use of certain headings, subheadings, and defined terms from the Amended Complaint, is for ease of reference only and is not to be construed as an admission by the School Board.

Additionally, the School Board denies in its entirety the "Introduction" section preceding the numbered allegations in Plaintiff's complaint, including the website referenced therein, and further denies that Plaintiff is entitled to any relief.

### Responses to Individual Paragraphs

1.    *Plaintiff* **is African-American.**

Response:   Without knowledge, therefore denied.

2.    *Plaintiff* **has continuously resided in Hillsborough County since 2016.**

Response:   Without knowledge, therefore denied.

3.    **Defendant The School Board of Hillsborough County, Florida operates, controls and supervises all free public schools within Hillsborough County pursuant Art. IX § 4 and Fla. Stat. § 1001.42.**

Response:  Admitted that the School Board operates, controls, and supervises the free public schools in Hillsborough County. The remainder of this paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves.

4.      **The HCSB accepts federal funds through the Individuals with Disabilities Education Act ("IDEA"), Title I-VII, and the Cares Act.**

Response:   Admitted that the School Board accepts federal funding. The remainder of this paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves.

5.      **This court has jurisdiction pursuant 42 U.S. Code § 3613.**

Response:   Admitted only that the School Board does not contest the Court's jurisdiction. The remainder of this paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves. Otherwise denied.

6.      **Venue is proper pursuant 28 U.S.C. § 1391 because Defendant reside in the Middle District of Florida, and all events giving rise to Plaintiff's claims occurred in the Middle District of Florida.**

Response:   Admitted only that the School Board does not contest venue in this matter. Denied that Plaintiffs experienced any "events" that entitle them to claimed relief. The remainder of this paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves. Otherwise denied.

7.      **The EEOA declares unlawful segregation as "the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student".**

Response:   This paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves. Otherwise denied.

8.      **As laid out below, the HCSB has a pattern and/or practice of assigning students to farther away schools resulting in more segregation, in violation of the EEOA.**

Response:   Denied.

9.      **For the purposes of this complaint, the following regions are defined as follows:**

Response:   This paragraph does not set forth any allegations, but rather appears to be a general introduction for the following paragraphs. To the extent this paragraph is deemed to set forth an allegation, denied.

10.    ***South Tampa* is defined as the area between Gandy Boulevard and Kennedy Boulevard.**

Response:  Admitted only that Plaintiff is purporting to use these definitions in the complaint, and those definitions apparently hold the stated meanings to Plaintiff. Otherwise denied.

11.    ***West Tampa* is defined as the area between Kennedy Boulevard and Busch Boulevard/Linebaugh Avenue, and west of I-275.**

Response:  Admitted only that Plaintiff is purporting to use these definitions in the complaint, and those definitions apparently hold the stated meanings to Plaintiff. Otherwise denied.

12.    ***East Tampa* is defined as the area between Kennedy Boulevard and Fletcher Avenue, and east of I-275.**

Response:  Admitted only that Plaintiff is purporting to use these definitions in the complaint, and those definitions apparently hold the stated meanings to Plaintiff. Otherwise denied.

13.    ***South Tampa*'s population is predominantly White. *see* Exhibits A and B.**

Response:   Without knowledge, therefore denied. [2]

14.    **West Tampa's population is predominantly Hispanic. see Exhibits A and C.**

Response:   Without knowledge, therefore denied.

---

[2] First, Plaintiff does not authenticate or explain the origin or modification of his exhibits. Second, the School Board does not dispute any official census data, but does not have any independent knowledge to admit or deny Plaintiff's allegations. All remaining paragraphs involving purported exhibits and/or population data are further denied for those same reasons.

15. **East Tampa's population is predominantly African-American. see Exhibits A and D.**

Response:   Without knowledge, therefore denied.

16. **The racial demographics rapidly change at Kennedy Boulevard. Kennedy is generally the demarcation point between affluent whites and minorities.**

Response:   Without knowledge, therefore denied.

17. **The three *South Tampa* elementary schools which border *West Tampa*–Grady, Mitchell, and Gorrie–currently have utilization rates of 118%, 111%, and 107%, respectively. *see* Exhibits E.**

Response:   Denied.

18. **The three *West Tampa* elementary schools which border *South Tampa*–Tampa Bay Boulevard, West Tampa, and Just–currently have utilization rates of 63%, 84%, and 41%, respectively. *see* Exhibits E.**

Response:   Denied.

19. **The bordering *South Tampa* schools are extremely over utilized, while the bordering *West Tampa* are extremely underutilized.**

Response:   Denied.

20. **The obvious solution is to shift the school boundaries southward, sending some of the white students from over-utilized *South Tampa* to underutilized–majority minority–*West Tampa* to balance out the utilization.**

Response:   Denied.

21. **Rather than do this, the HCSB has proposals to close a minority school and leave the bordering *South Tampa* schools at a staggering 100-119% utilization despite their stated goal to reduce utilization to the 80% range.**

Response:   Denied.

22.   **The HCSB will not lower those utilization rates to the 80% range, because that would mean sending white students to bordering minority schools.**

Response:   Denied.

23.   **The following map shows the locations and boundaries for Plant High School (orange), Jefferson High School (yellow), and Blake High School (purple):**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Therefore, denied.

24.   **Plant High School is nearly _twice_ as far from Davis Island as Blake High School is by ground transportation, yet students in that affluent white enclave are not assigned to Blake, a predominantly African-American school.**

Response:   The School Board admits the school boundary lines are public record and speak for themselves. Otherwise denied.

25.   **Similarly, the neighborhoods of Westshore Palms, North Bon Air, Beach Park, and Oakford Park are at least twice as close to Jefferson High School than Plant, and in some cases literally across the street from Jefferson, yet those white students are assigned to Plant and the school district is unable to give a cognizable reason why.**

Response:   The School Board admits the school boundary lines are public record and speak for themselves. Otherwise denied.

26.   **The reason for the odd shape of the boundaries becomes clear when you overlay those boundaries over a map of the racial demographics, as illustrated in the following image:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiffs do not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

70614833;1

27.     **The most egregious part is that Plant is overpopulated, and yet they still will not send those white students to predominantly minority Jefferson High School and Blake High School.**

Response:   Denied.

28.     **The following image shows just how maladjusted the current Plant High School boundaries are, when overlaid with the boundaries for the closest high schools. The shaded area highlight portions of Plant High School's current boundary that are closer to Jefferson High School and Blake High School:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiffs do not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

29.     **The situation with Coleman Middle School is similar to Plant High School: Coleman's boundary is artificially kept lower to exclude assigning the large African-American population directly to their north, despite them being significantly closer to Coleman than Pierce.**

Response:   The School Board admits the school boundary lines are public record and speak for themselves. Otherwise denied.

30.     **Madison to the South of Coleman, is exerting pressure to move Coleman's boundaries up. But to avoid doing this, the District is proposing plans to just close Madison or Monroe, to avoid sending white students to minority schools directly to the north.**

Response:   The School Board admits the school boundary lines and proposals are public record and speak for themselves. Otherwise denied.

31.     **The following image shows the locations of Coleman, Pierce, and Madison, over-layed over a map of race. The black lines represent the border for the closest school:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiffs do not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

32.    **Not only did the school board segregate the students, they segregated themselves. They drew district map boundaries that correspond directly to race: the Hispanic population is almost exclusively located in district 1, the African-American population in district 5, and white population in district 2.**

Response:   Denied.

33.    **This image shows the racial map overlaid with the district boundaries shown in blue lines:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiffs do not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

34.    **The racial segregation in the district map was intentional.**

Response:   Denied.

35.    **The HCSB stated "Given the population distribution in Hillsborough County, having a high black population in District Five maximizes the opportunity for a minority candidate to be elected. When considering the demographic profile of each map, any map that identified a significant reduction in the black population in District Five was discarded".**

Response:   The document cited by Plaintiffs in footnote 2 to paragraph 35 speaks for itself. Otherwise denied.

36.    **The HCSB stated "The black population percentage for district five. is 41.1%".**

Response:   The document cited by Plaintiffs in footnote 3 to paragraph 36 speaks for itself. Otherwise denied.

37.    **The black population percentage for Hillsborough County is approximately 18%.**

Response:   The School Board does not dispute publicly available census data, but is without independent knowledge, and therefore denies, Plaintiffs' allegations regarding population percentages within Hillsborough County. Otherwise denied.

38.    **The school board intentionally drew their district map to concentrate their black population in District 5.**

Response:   Denied.

39.    **By concentrating the black population in District 5, they remove the black population from the other districts causing other races to be segregated as well. The end result was a map where Hispanic (District 1), black (District 5), and white (District 2, 3, and 4) populations were segregated into their own respective districts.**

Response:   Denied.

40.    **Hillsborough County home buyers and renters frequently make decisions on which neighborhoods to purchase or rent based substantially on the public schools that are assigned to properties.**

Response:   Without knowledge, therefore denied.

41.    **The assigned schools are provisioned services and/or facilities in connection with the residence that is assigned to them.**

Response:   Denied.

42.    **The HCSB is the entity who assigns public schools to specific residences, usually through the promulgation of a boundary map.**

Response:   The School Board admits it is the entity that determines the boundary maps for public school assignments. Otherwise denied.

43.    **Promulgating school boundary maps that unlawfully segregate by race under the EEOA is de facto racial discrimination under the Fair Housing Act.**

Response:   This paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves. Otherwise denied.

44.    **At all times relevant, there has been at least one residential real estate property for sale in each of the affected neighborhoods.**

Response:   Denied to the extent Plaintiff alleges the School Board had had "at least one residential real estate property for sale in each of the affected neighborhoods." Otherwise without knowledge, therefore denied.

45. **"Steering" is the practice of influencing a buyer's choice of communities based upon one of the protected characteristics under the Fair Housing Act, which are race, color, religion, gender, disability, familial status, or national origin.**

Response:  This paragraph is a legal characterization that requires no factual response, as the applicable laws speak for themselves. Otherwise denied.

46. **"Redlining" is a discriminatory practice that puts services (financial and otherwise) out of reach for residents of certain areas based on race or ethnicity, often times by drawing lines on maps.**

Response:  This paragraph is a legal characterization that requires no factual response, as the applicable laws speak for themselves. Otherwise denied.

47. **The HCSB artificially inflated the property values in *South Tampa* by racially segregating white students into white schools to fabricate "A-rated" schools by excluding minority students.**

Response:  Denied.

48. **On the flip side, this caused the schools that were deprived of those white students to get less resources and lower school grades, which depressed property values in homes assigned to those manufactured minority schools.**

Response:  Denied.

49. **This pricing imbalance steered minorities to minority neighborhoods that they could only afford due to HCSB segregation based pricing manipulation, and affluent white people to the segregated white neighborhoods, further entrenching the segregation. Effectively redlining along the HCSB's segregated school boundaries.**

Response:  Denied.

50. **As an African-American who has been the subject of discrimination throughout his life, Mr. Warner is particularly sensitive to discriminatory practices. Mr. Warner was insulted and emotionally distressed by the knowledge that school aged students in**

his community–including his child–were being discriminated against because of their race... in the year 2023.

Response:   Without knowledge, therefore denied. Further denied to the extent this paragraph includes any suggestion the School Board engaged in unlawful discrimination.

51.   **Mr. Warner was and is saddened, angered, and insulted by the fact that the HCSB continues to operate a segregated school system.**

Response:   Without knowledge, therefore denied. Further denied to the extent this paragraph includes any suggestion the School Board engaged in unlawful discrimination.

52.   **Defendant's unlawful conduct proximately caused Mr. Warner to suffer the aforementioned emotions, which have manifested into stress, unpleasant rumination, mental strain, and feelings of indignity, hopelessness and anxiety about race discrimination in housing and the school system.**

Response:   Denied.

53.   **Due to HCSB's manipulation of property values, Plaintiff was priced out of *South Tampa* and had to relocate to relocate outside of *South Tampa* and resulting in a loss of community for Plaintiff.**

Response:   Denied.

54.   **Mr. Warner spent much of his childhood in South Tampa. He attended Tinker Elementary, Monroe Middle School, and Robinson High School there.**

Response:   Without knowledge, therefore denied.

55.   **The fact that the school boundaries correlate nearly 1-to-1 directly to race.**

Response:   Denied.

56.   **The fact that the school board explicitly used race to draw the district maps to segregate.**

Response:   Denied.

70614833;1

57.    **The fact that the HCSB has a history of refusing to desegregate.**

Response:   Denied.

58.    **The fact that the HCSB was notified several times that they were in violation of the EEOA, and provided racial maps and other evidence in support of that assertion, yet the HCSB ignored it and pressed forward with racial segregated maps and proposals.**

Response:   Denied.

59.    **The fact that Blake High School was the negro High School in the 50's before desegregation, and it remains a segregated negro High School in 2023 due to the obvious gerrymandering of Blake High School.**

Response:   Denied.

60.    **The fact that white students across the street from Jefferson High School are not assigned to Jefferson High School.**

Response:   Denied.

61.    **The affluent white residents of *South Tampa* wield tremendous political influence in relation to the other parts of Hillsborough County.**

Response:   Without knowledge, therefore denied.

62.    **Those affluent white *South Tampa* residents are currently exerting tremendous pressure on the HCSB to not implement certain proposed school boundary changes that would assign some of their homes to Jefferson High School, despite their homes being geographically closer to Jefferson, because generally they do not want their children attending Jefferson High School (a low performing minority school) and because their property values will drop if their homes are reassigned from A-rated Plant High School to C-rated Jefferson High School.**

Response:   Without knowledge, therefore denied.

63.    **Superintendent Addison Davis has capitulated to this political pressure, and has expressed assurances to certain school**

**board members that he will not submit the proposal that reassigns white students to Jefferson High School, while publicly stating that no decision has been made:**

Response: This paragraph purports to include and rely upon a picture, likely a social media screenshot, which Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

64. **The school board members are poised to approve yet another racially segregated map, despite knowing full and well that those maps are racially segregated, because they lack the political courage to overcome that political pressure from *South Tampa* residents:**

Response: This paragraph purports to include and rely upon a picture, likely a social media screenshot, which Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

65. **School Board Member Dr. Stacy Hahn's comments about "fighting everyday" to keep District 2 (white) family's in District 2 schools (white).**

Response:   Denied.

66. **A discriminatory purpose, not any legitimate reason, was a motivating factor behind Defendant's aforementioned discriminatory actions and/or omissions.**

Response:   Denied.

67. **On or about January 11, 2023, Dr. Stacy Hahn gave a news interview with New Channel 8 WFLA.**

Response:   Admitted.

68. **This interview was broadcast on public television as well as printed on WFLA's website.**

Response:   Admitted.

13

69.   **Dr. Hahn knew when she agreed to this interview, that it would be published and/or printed on television and/or the WFLA website.**

Response:   Without knowledge, therefore denied.

70.   **During this interview, Dr. Hahn stated "I can tell you that I am fighting every day to make sure District 2 families stay in District 2 schools,".**

Response:   This paragraph purports to describe a written article Plaintiffs linked. As that document is the best evidence of its own contents and speaks for itself, denied. Further denied to the extent this paragraph implies unlawful discrimination by the School Board.

71.   **There is no legal basis for District 2 families to stay in District 2. School boundaries routinely cross those arbitrary Districts, whose sole purpose is for electing school board members, not for school boundaries.**

Response:   This paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves. To the extent this paragraph is deemed to suggest the School Board engages in unlawful discrimination, denied.

72.   **"District 2" is the racially gerrymandered Caucasian district that Dr. Hahn represents. "District 2" 's population is predominantly white.**

Response:   Denied.

73.   **District 1's population is predominantly minority and borders District 2 to the north.**

Response:   The School Board does not dispute publicly available census data, but is without independent knowledge, and therefore denies, Plaintiffs' allegations regarding population percentages within Hillsborough County. Otherwise denied.

74.   **Dr. Hahn's statement is dog whistling, telling white residents in South Tampa that she is fighting hard not to send their white children to a minority dominated schools in District 1.**

Response:   Denied.

75.    **Dr. Hahn's statement indicates a preference for white people to live and attend white schools in District 2, and consequently for minority students to attend schools in District 1.**

Response:   Denied.

76.    **The current school boundaries are arbitrary and the HCSB cannot have any legitimate objective for them because they violate the EEOA.**

Response:   Denied.

77.    **The current school boundaries disproportionately affect racial minorities by isolating them into under-performing schools, while the isolated white students excel in A-Rated schools.**

Response:   Denied.

78.    **This further harms the minority communities in east Tampa and west Tampa, because their property values are decreased, while the property values increase in the white neighborhoods.**

Response:   Denied.

### Count I: 42 U.S. Code § 3604: Intentional Discrimination[3]

79.    *Plaintiffs* **re-alleges and incorporates by reference ¶ 1 – 78**

Response:   The School Board restates its responses to paragraphs 1–78 above.

80.    **Defendant intended to unlawfully segregate students by race and/or color through South Tampa school assignment boundary maps which are the terms, conditions, or privileges of a sale or rental of a dwelling, or the provision of services or facilities in connection therewith; or otherwise made housing unavailable by pricing minorities out of south tampa due to unlawful pricing manipulation.**

Response:   Denied.

---

[3] The School Board reiterates that the headings are included solely for convenience, and it affirmatively denies all allegations that might be deemed to exist within them.

70614833;1

## Count II: 42 U.S. Code § 3604: Disparate Impact

81.    *Plaintiffs* re-alleges and incorporates by reference ¶ 1 – 78

Response: The School Board restates its responses to paragraphs 1–78 above.

82.    **Defendant's school assignment boundary maps had a discriminatory effect on minority students in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of south tampa services or facilities in connection therewith, because of race and/or color, or otherwise made housing unavailable by pricing minorities out of south tampa due to unlawful pricing manipulation.**

Response:   Denied.

∷

**The School Board further denies all allegations contained in the "Wherefore" paragraph at the end of Plaintiff's complaint, and further denies that Plaintiff is entitled to any claimed relief.**

## <u>AFFIRMATIVE DEFENSES</u>

Without conceding that the School Board bears the burden of proof as to any issue, and without conceding liability, the School Board asserts the following defenses to Plaintiff's complaint:

### FIRST DEFENSE

The Eleventh Circuit previously declared the Hillsborough County school system unitary, ceasing federal judicial supervision of the Hillsborough County school system. *See Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty., Fla.*, 244 F.3d 927, 947 (11th Cir. 2001). Plaintiff's claims fail to the extent they seek relieve inconsistent with *Manning* and to the extent Plaintiff

challenges school boundary lines in place or demographic shifts that began to occur, prior to the *Manning* opinion.

**SECOND DEFENSE**

The Plaintiff has not suffered any harm because he received his preferred and requested school assignment.

**THIRD DEFENSE**

Plaintiff's claims are barred by release, discharge, and waiver. Plaintiff previously executed a Settlement Agreement with the School Board. Because the Settlement Agreement is confidential, the School Board attached a mostly-redacted version as **Exhibit 1**.[4] Pursuant to the Settlement Agreement, Plaintiff received a specific school assignment for his minor child. Additionally, the Settlement Agreement includes a broad release where Plaintiff agreed as follows:

> **5. <u>Release of the School Board and District</u>:** For and in consideration of the required acts and promises set forth in this Agreement, the **Parent hereby knowingly and voluntarily releases and discharges the School Board and District from any and all claims, demands, causes of action, complaints or charges, known or unknown** specifically related J.W.'s education, services, and educational program in the District **through the date of the execution of this Agreement**.

---

[4] Because the Settlement Agreement is confidential, the School Board attaches a mostly-redacted version as Exhibit 1. Prior to this filing, the parties conferred and agreed to the redactions made.

70614833;1

This shall include, but not be limited to, all claims for services, supports, therapies, evaluations, tutoring, training, compensatory education or services, reimbursements, or claims for expenses, costs, fees, attorneys' fees, **and all losses of any kind whatsoever related specifically to J.W.'s education**, **which the Parent has or might have by virtue of any fact(s), act(s) or event(s) occurring prior to the Effective Date of this Agreement**.

The Parent understands that this **release shall also cover any claims, if any, that may belong independently to J.W. related to his educational services and program**. The claims described in this paragraph shall be collectively referred to as "Released Claims" herein. The Parties jointly agree that the release in this paragraph shall not act to impair the enforceability of this Agreement or a waiver of the Parties' respective rights to take action to enforce this Agreement. The Parties further agree that this release shall not cover any claim that is not regarding J.W.'s education or any new claim that may arise by reason of an act or omission occurring after the Effective Date of this Agreement. To that end, the School Board and District acknowledge that no provision in this Agreement may be construed as relieving them of any obligation they may have under federal or state law to provide J.W. a FAPE for any time after the execution of this Agreement.

*See* Settlement Agreement, ¶ 5 (emphasis added).

Moreover, Plaintiff admits his claims are premised on the contractual assignment (*i.e.*, his choice) under the settlement agreement. *See* Plaintiffs' email dated May 17, 2023, attached as **Exhibit 2**, admitting his "EEOA counts are premised on the contractual assignment of J.W. to Coleman Middle School and Plant High School."

18

Because Plaintiff voluntary chose to have his child attend the assigned school and because of the release he executed, Plaintiff's claims fail as a matter of law.

## FOURTH DEFENSE

Any purported imbalances are naturally attributable to the intervening acts of third parties, specifically the natural flow of people within a community (particularly one growing as quickly as Tampa) and are not attributable to any purported actions by the School Board.

## FIFTH DEFENSE

By affirmatively requesting and receiving their preferred school placements, the Plaintiff waived any ability to sue based on the purported placements.

## SIXTH DEFENSE

The School Board at all relevant times has acted reasonably, properly, lawfully, and in good faith.

## SEVENTH DEFENSE

The relief sought by Plaintiff is unreasonable and constitutes an undue hardship on the School Board.

70614833;1

## EIGHTH DEFENSE

The School Board is not in business of selling or renting dwelling units, and accordingly, cannot be held liable under 42 U.S.C. § 3604. *See* 42 U.S.C § 3603(c).

## NINTH DEFENSE

Plaintiff's claims are barred by the Eleventh Amendment, which bars suits brought by private citizens against a state or arm of the state in federal court without consent. *See McCardell v. U.S. Dept. of Housing and Urban Development*, 794 F.3d 510, 521-22 (5th Cir. 2015) (holding state defendants, which were arms of the state of Texas, had not consented to suit brough under the Fair Housing Act).

## TENTH DEFENSE

Plaintiff lacks standing to sue.

## ELEVENTH DEFENSE

Plaintiff's claims are barred to the extent they are premised upon Plaintiff J.W.'s assignment, using his prior 502 S. Fremont Avenue address as outlined in paragraph 10 of the Complaint, in light of Plaintiffs' email dated May 17, 2023, attached as **Exhibit 2**, withdrawing any such allegation.

Similarly, Plaintiffs' claims within Counts I (28 U.S. Code § 1703(a)), II (28 U.S. Code § 1703(c)), and III (28 U.S. Code § 1983) of the original complaint are barred by Plaintiffs' Notice of Abandonment of Counts I and II, filed on

May 18, 2023, *see* Dkt. 28, and by virtue of Plaintiff's filing of the Amended

Verified Complaint omitting those claims.

## RESERVATION OF RIGHTS

The School Board reserves the right to assert additional affirmative

defenses and to supplement its current affirmative defenses as discovery

warrants.

:::

Having fully answered the Plaintiff's complaint, the School Board

requests the court enter an order:

(a)   Dismissing the complaint against the School Board with prejudice;

(b)   Ordering that the Plaintiff take nothing by this action;

(c)   Awarding the School Board its costs and attorney's fees associated
      with this litigation, pursuant to 42 U.S.C. § 1988(b), 42 U.S.C.
      § 3613(c)(2), or otherwise; and

(d)   Awarding the School Board such other and further relief as the
      Court deems just and proper.

70614833;1

Respectfully submitted,

/s/ *Jason L. Margolin*

**Jason L. Margolin, Esq.**
Florida Bar No. 69881
jason.margolin@akerman.com
judy.mcarthur@akerman.com
**Gregg M. Moran, Esq.**
Florida Bar No. 1011060
gregg.moran@akerman.com
ava.hill@akerman.com
Aᴋᴇʀᴍᴀɴ LLP
401 E. Jackson Street, Suite 1700
Tampa, Florida 33602
(813) 223-7333 / Fax: (813) 223-2837
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of May 2023, I filed the foregoing using

the Court's e-portal and served an additional copy on Blake Warner at

blake@null3d.com.

/s/ *Jason L. Margolin*
Counsel for Defendant

70614833;1

# Doc. 37

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BLAKE WARNER, on behalf of himself
and his minor child, J.W.,

      Plaintiff,

v.                                CASE NO. 8:23-cv-1029-SDM-SPF

THE SCHOOL BOARD OF
HILLSBOROUGH COUNTY,
FLORIDA,

      Defendant.

_____/

### ORDER

Alleging that the Hillsborough County School Board unlawfully both segregates the schools and refuses to assign his child to the school closest to his place of residence, Blake Warner, appearing *pro se* on behalf of himself and his minor child, sues (Doc. 19) the School Board and asserts claims under 20 U.S.C. § 1703; under 42 U.S.C. § 1983; and under Florida law.

In a pending, earlier-filed action, *Warner v. School Board of Hillsborough County, Florida*, No. 8:23-cv-181-SDM-JSS (M.D. Fla.), Warner on behalf of himself and his minor child alleged racial segregation and asserted claims under 20 U.S.C. § 1703, 42 U.S.C. § 1983, and 42 U.S.C. § 3604. Under *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1236 (11th Cir. 2021), a plaintiff may not "improperly split [] claims" between or among two or more actions. The claims in this action and the claims in the

earlier-filed action appear premised on a common aggregate of facts, that is, appear premised on the "same transaction or series of transactions" — the alleged segregation of the schools in Hillsborough County.  For that reason, an order directs Warner to "explain why an order should not dismiss this action for improperly splitting his claims between two actions."

In the earlier-filed action, Warner moves to consolidate the actions and amends the complaint to include only claims under 42 U.S.C. § 3604 and asserted only on behalf of himself.  *Warner*, Docs. 27 and 29, No. 8:23-cv-181-SDM-JSS.  In this action, Warner reports (Doc. 15) the amendment in the earlier-filed action and contends (1) that the actions are "temporally distant" and (2) that the earlier-filed action "focuses on harm" to Warner but this action "focuses on harm" to Warner's child.  Arguing, among other things, that despite the amendment in the earlier-filed action Warner continues to impermissibly split his claims between the two actions, the School Board moves (Doc. 18) to dismiss.

In response to the motion to dismiss, Warner in this action amends the complaint (the amendment moots the motion to dismiss), adds himself as a plaintiff asserting a claim under 20 U.S.C. § 1703, adds a claim under 42 U.S.C. § 1983 on behalf of himself and his child, and replaces the claim under Florida law with a request for a writ of mandamus.  But by adding himself as a plaintiff in the amended complaint in this action, Warner undercuts his attempt to avoid claim splitting by removing his child as a plaintiff in the earlier-filed action.  As previously stated, Warner cannot "improperly split [his] claims" between or among actions that "arise from the

- 2 -

same transaction or series of transactions." *Kennedy*, 998 F.3d at 1236. According to *Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 842–43 (11th Cir. 2017), actions originate in the same transaction or series of transactions if the actions "are related in time, origin, and motivation, and they form a convenient trial unit[.]" Further, *Vanover* affirms the decision that "splitting the time frame into two different periods does not create a separate transaction." Indeed, *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000); *Zerilli v. Evening News Association*, 628 F.2d 217, 222 (D.C. Cir. 1980); and *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977); persuasively hold that a plaintiff may not "maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant."

In both this action and the earlier-filed action, Warner appears as a plaintiff; sues the same defendant, the School Board; and asserts claims based on the School Board's allegedly ongoing segregation of the schools in the county. These actions "form a convenient trial unit." Discovery in each action will overlap. Although the injury alleged in one action reportedly occurred at a time different from the injury alleged in the other action, the allegedly ongoing segregation caused each alleged injury. Thus, Warner must assert his claims about the School Board's alleged segregation in a single action.

Further, neither party discusses Warner's ability to prosecute *pro se* his child's claims. Although a parent may appear as plaintiff on behalf of a minor child, who lacks the capacity to sue, "parents who are not attorneys may not bring a *pro se* action on their child's behalf." *FuQua v. Massey*, 615 Fed. App'x 611, 612 (11th Cir. 2015)

(quoting *Devine v. Indian River Cnty. Sch. Bd.*, 121 F.3d 576, 581 (11th Cir. 1997) *over-ruled in part on other grounds, Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 535 (2007)).   Thus, if Warner intends to appear as plaintiff on behalf of his minor child and assert his child's claims, Warner must appear through a lawyer. (Again, Warner may assert *pro se* claims on behalf of himself only.)

For these reasons and because (as the parties agree) Warner cannot assert a claim for a writ of mandamus against a state official, *Butt v. Zimmerman*, 2022 WL 5237916 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 1059 (2023), the complaint is **DIS-MISSED WITHOUT PREJUDICE**.  Warner must assert his claims against the School Board in a single action.  No later than **JULY 28, 2023**, Warner may amend the complaint in the earlier-filed action, *Warner*, 8:23-cv-00181-SDM-JSS, and assert his claims against the School Board.  The clerk is **DIRECTED** to file a copy of this order in the earlier-filed action.

If Warner intends to appear as a plaintiff to assert his son's claims, Warner must appear through a lawyer.  No later than **JULY 28, 2023**, a lawyer must appear, or an order will dismiss this action without further notice.  The motion (Doc. 18) to dismiss the original complaint in this action is **DENIED AS MOOT**.  The motion (Doc. 11) for a preliminary injunction and the motion (Doc. 20) to amend the mo-tion for a preliminary injunction are **DENIED AS MOOT**.  Warner may amend the motion for a preliminary injunction after a lawyer appears and amends the com-plaint.  The motion (Doc. 27) to rule on the pending show-cause order is **DENIED AS MOOT**.

Also, after Warner amended the complaint in this action, the School Board again moved (Doc. 21) to dismiss but failed to include a certificate in accord with Local Rule 3.01(g).  In response, Warner (1) filed (Doc. 22) a "notice of lack of Local Rule 3.01(g) compliance," which reports that the School Board failed to confer before filing the motion to dismiss, and (2) separately responded (Doc. 24) to the motion to dismiss.  The response conceded that "federal mandamus is inappropriate[]" but otherwise opposed the motion to dismiss.  To remedy the Local Rule violation, the School Board unilaterally amended (Doc. 23) the motion to dismiss to add a Local Rule 3.01(g) certificate, which states that the parties conferred by e-mail and telephone and that the parties disagree about the motion.  Warner responded to the amended motion and asserted that the 3.01(g) certificate falsely represented the conference.  The first motion (Doc. 21) to dismiss the amended complaint is **STRICKEN** for failure to comply with Local Rule 3.01(g).  And counsel is **WARNED** to comply carefully with all applicable rules, including the Local Rules.  The amended motion (Doc. 23) to dismiss the amended complaint is **DENIED AS MOOT**.

ORDERED in Tampa, Florida, on July 5, 2023.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

# Doc. 38

# United States District Court
## For The Middle District of Florida
## Tampa Division

Blake Warner

v.

The School Board of
Hillsborough County Florida

Case Number 8:23-CV-181-SDM-JSS

## Second Amended Verified Complaint

## Introduction

Plaintiff, Blake Warner, *pro se*, hereby amends his complaint, pursuant the Court's order Doc. 37, against The School Board of Hillsborough County, Florida ("HCSB") for violations of Title VI of 42 U.S.C. § 2000d et seq ("1964 Civil Rights Act"), 20 U.S.C. 1703 ("Equal Educational Opportunities Act"), 42 U.S. Code § 3601 et seq ("Fair Housing Act"), and Art. IX, § 1, Fla. Const. for unlawful manipulation of housing values in Hillsborough County through operating a segregated school system, and 42 U.S.C. § 1983 for denying him due process with the school choice application process.

The HCSB has significantly contributed to racial imbalance in the Hillsborough County housing market by drawing boundaries around racial lines. The HCSB then

used these racial boundaries as a pretext for discrimination through redlining and steering.

An interactive version of the map boundaries presented are available at: https://grandwizarddavis.de/

## PLAINTIFF

1. Mr. Warner is African-American.

2. Mr. Warner has continuously resided in Hillsborough County since 2016.

## DEFENDANT

3. Defendant The School Board of Hillsborough County, Florida operates, controls and supervises all free public schools within Hillsborough County pursuant Art. IX § 4 and Fla. Stat. § 1001.42.

4. The HCSB accepts federal funds through the Individuals with Disabilities Education Act ("IDEA"), Title I-VII, and the Cares Act.

## JURISDICTION AND VENUE

5. This court has jurisdiction pursuant 28 U.S. Code § 1331, 1367, 1343, 2201, and 2202, and 42 U.S. Code § 3613 and 1983.

6. Venue is proper pursuant 28 U.S.C. § 1391 because Defendant reside in the Middle District of Florida, and all events giving rise to Mr. Warner's claims occurred in the Middle District of Florida.

## PARENTAL RIGHTS

7. Mr. Warner has a fundamental right under the Fourteenth Amendment to make decisions concerning the care, custody, education, and control of J.W. *see* Troxel v. Granville (2000).

8. The educational welfare/placement of J.W. is closely tied to the Mr. Warner's Fourteenth Amendment fundamental rights and his ability to advocate for J.W.'s rights.

9. The state of Florida has additionally given Mr. Warner the following rights:

   (a) The right to direct the education and care of J.W.[1]; and

   (b) The right, pursuant to s. 1002.20(2)(b) and (6), to apply to enroll J.W. in a public school[2].

## EEOA

10. The EEOA declares unlawful segregation as "the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student".

11. As laid out below, the HCSB has a pattern and/or practice of assigning students to farther away schools resulting in more segregation.

## Tampa Regions

12. For the purposes of this complaint, the following regions are defined as follows:

13. *south tampa* is defined as the area between Gandy Boulevard and Kennedy Boulevard.

---

[1] *see* Fla. Stat. § 1014.04(a)
[2] *see* Fla. Stat. § 1014.04(c)

14. *west tampa* is defined as the area between Kennedy Boulevard and Busch Boulevard/Linebaugh Avenue, and west of I-275.

15. *east tampa* is defined as the area between Kennedy Boulevard and Fletcher Avenue, and east of I-275.

16. *south tampa*'s population is predominantly White. *see* Exhibits A and B.

17. *west tampa*'s population is predominantly Hispanic. *see* Exhibits A and C.

18. *east tampa*'s population is predominantly African-American. *see* Exhibits A and D.

19. The racial demographics rapidly change at Kennedy Boulevard. Kennedy is generally the demarcation point between affluent whites and minorities.

## MAP COMPACTNESS

20. Compactness is a quantitative measure of a boundary's shape and how tightly packed, or compact, the boundary is.

21. The compactness of a boundary is a critical measure when evaluating if a boundary is discriminatory. A map that is not compact may be considered gerrymandered.

22. All of the compactness measures and boundaries provided here are approximate, and are subject to change as more data becomes available before trial.

# I   SCHOOLS

## SCHOOL BOUNDARY COMPACTNESS

23. All of the Hillsborough County school statistics cited here and attached are approximate and based on imperfect data, such as some schools missing and non-exact boundary definitions. These statistics and graphs will change slightly and improve as more data becomes available through discovery.

24. The School Board only has three high schools which have compact boundaries:



LENNARD HIGH SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 78% | Grade: | C |
| Minorities: | 72.5% | Utilization: | 96% |
| LS Exclusion: | 6% | FS Inclusion: | 17% |
| Displacement: | 0.35:1 | R: | compact |

ALONSO HIGH SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 78% | Grade: | A |
| Minorities: | 72% | Utilization: | 97% |
| LS Exclusion: | 13% | FS Inclusion: | 10% |
| Displacement: | 1.39:1 | R: | compact |

ROBINSON HIGH SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 94% | Grade: | A |
| Minorities: | 52.5% | Utilization: | 75% |
| LS Exclusion: | 0% | FS Inclusion: | 4% |
| Displacement: | 0.08:1 | R: | compact |

25. The two of the top three *least* compact high schools are negro schools:



BLAKE HIGH SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 26% | Grade: | C |
| Minorities: | 76.4% | Utilization: | 90% |
| LS Exclusion: | 49% | FS Inclusion: | 63% |
| Displacement: | 0.55:1 | R: | gerrymandered |

GAITHER HIGH SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 30% | Grade: | B |
| Minorities: | 62.9% | Utilization: | 98% |
| LS Exclusion: | 65% | FS Inclusion: | 29% |
| Displacement: | 4.49:1 | R: | gerrymandered |

MIDDLETON HIGH SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 34% | Grade: | C |
| Minorities: | 87.5% | Utilization: | 76% |
| LS Exclusion: | 61% | FS Inclusion: | 24% |
| Displacement: | 4.91:1 | R: | gerrymandered |

26. Nearly all of the School Board's school boundaries are gerrymandered. *see* Exhibits X, Y, and Z.

There is only one compact Middle School: Shields Middle School. The rest are gerrymandered.

27. The top three *least* compact middle schools are: Randall Middle School, Memorial Middle School, and Barrington Middle School:



| RANDALL MIDDLE SCHOOL | | MEMORIAL MIDDLE SCHOOL | | BARRINGTON MIDDLE SCHOOL | |
|---|---|---|---|---|---|

| Accuracy: | 7% | Grade: | A | Accuracy: | 25% | Grade: | C | Accuracy: | 23% | Grade: | B |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minorities: | 32.5% | Utilization: | 98% | Minorities: | 90.5% | Utilization: | 57% | Minorities: | 51.4% | Utilization: | 97% |
| LS Exclusion: | 92% | FS Inclusion: | 28% | LS Exclusion: | 52% | FS Inclusion: | 64% | LS Exclusion: | 28% | FS Inclusion: | 73% |
| Displacement: | 30.71:1 | R: | gerrymandered | Displacement: | 0.60:1 | R: | gerrymandered | Displacement: | 0.14:1 | R: | gerrymandered |

## A.   NUMBERS DEFINED

28. A "Local Student" is a student who resides closest to that school. A "Foreign Student" is a student who is resides closer to a different school. In a perfectly compact map, a foreign student would never be assigned because they would always be assigned to their closest school where they are a local student.

29. The Local Student Exclusion Ratio ("LS Exclusion") represents the percent of local students who are not assigned to that school. A LS Exclusion

ratio of 0.2 means that 20% of the local students are assigned to a different more geographically distant school.

30. The green area represents the area of local students are actually assigned to that school.

31. The red area in the graphs represents local students who are excluded from that school. The LS Exclusion ratio is calculated as:

$$LER = \frac{area(red)}{area(green) + area(red)} \tag{1}$$

32. The Foreign Student Inclusion Ratio ("FS Inclusion") represents the percent of assigned students who are foreign students. A FS Exclusion ratio of 0.4 means that 40% of the assigned student population are foreign students.

33. The yellow area represents the foreign students. The FS Inclusion ratio is calculated as:

$$FIR = \frac{area(yellow)}{area(green) + area(yellow)} \tag{2}$$

34. The displacement ratio represents that ratio between excluded local students and included foreign students. For example, a displacement ratio of 12:1 indicates that 12 local students lost their seat at that school for every 1 foreign student that was assigned. A high displacement ratio indicates that a school is trying hard not to assign local students and still fill capacity. A great example of this is A-rated Fishkawk Elementary which borders C-rated Pinecrest Elementary:



FISHHAWK CREEK ELEMENTARY SCHOOL    PINECREST ELEMENTARY SCHOOL

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Accuracy: | 13% | Grade: | A | Accuracy: | 65% | Grade: | C |
| Minorities: | 33.7% | Utilization: | 100% | Minorities: | 34.5% | Utilization: | 67% |
| LS Exclusion: | 86% | FS Inclusion: | 1% | LS Exclusion: | 1% | FS Inclusion: | 33% |
| Displacement: | 593.94:1 | R: | gerrymandered | Displacement: | 0.03:1 | R: | gerrymandered |

35. The Displacement ratio is calculated as:

$$D = \frac{area(red)}{area(red) + area(yellow)} \qquad (3)$$

36. Accuracy is a percent of how close the assigned boundary is to a perfectly compact boundary (closest school boundary). With 1.0 being perfectly accurate and 0.0 not being accurate at all. This is the closest single number to a measure of compactness used in this document.

37. Accuracy is calculated as:

$$A = \frac{area(green)}{area(red) + area(yellow) + area(green)} \qquad (4)$$

38. Utilization is the school utilization percent, and is from the School Board's last published 40-day enrollment numbers.

8

39. Minorities represents the percent of the school's student that are minorities.

### B.   Analysis

40. Coincidentally, all of the compact school boundaries beset on two or more sides by natural borders or the county line. They are not compact due to the diligent efforts of the school board, they are compact only because the board did not have much discretion to screw it up.

41. Significant amounts of red and yellow areas are strong indicators of gerrymandering.

42. Blake and Middleton are the two negro high schools in Tampa; the high degree of non-compactness in these boundaries, combined with the nearby white neighborhoods that are not assigned to these schools suggests that race was the predominant factor when drawing these boundaries.

## South Tampa

### Elementary Schools

43. All of the *south tampa* school boundaries correspond nearly perfectly to the Home Owners' Loan Corporation ("HOLC") maps which was created by the federal government in 1933 which racially segregated housing. *see* Exhibit G and H.

44. The three *south tampa* elementary schools which border *west tampa*–Grady, Mitchell, and Gorrie–currently have utilization rates of 118%, 111%, and 107%, respectively. *see* Exhibits E.



GRADY ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 44% | Grade: | A |
| Minorities: | 41.4% | Utilization: | 104% |
| LS Exclusion: | 41% | FS Inclusion: | 36% |
| Displacement: 1.24:1 | | R: | gerrymandered |

MITCHELL ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 55% | Grade: | A |
| Minorities: | 36.4% | Utilization: | 96% |
| LS Exclusion: | 23% | FS Inclusion: | 32% |
| Displacement: 0.61:1 | | R: | gerrymandered |

GORRIE ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 60% | Grade: | A |
| Minorities: | 28.2% | Utilization: | 92% |
| LS Exclusion: | 39% | FS Inclusion: | 1% |
| Displacement:40.25:1 | | R: | gerrymandered |

45.  The three *west tampa* elementary schools which border *south tampa*–Tampa Bay Boulevard, West Tampa, and Just (until it closed)–currently have utilization rates of 63%, 84%, and 41%, respectively. *see* Exhibits E.



TAMPA BAY BOULEVARD ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 24% | Grade: | C |
| Minorities: | 95% | Utilization: | 55% |
| LS Exclusion: | 49% | FS Inclusion: | 68% |
| Displacement: 0.45:1 | | R: | gerrymandered |

WEST TAMPA ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 41% | Grade: | C |
| Minorities: | 95.6% | Utilization: | 68% |
| LS Exclusion: | 49% | FS Inclusion: | 30% |
| Displacement: 2.18:1 | | R: | gerrymandered |

JUST ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 30% | Grade: | F |
| Minorities: | 97.8% | Utilization: | 47% |
| LS Exclusion: | 33% | FS Inclusion: | 63% |
| Displacement: 0.29:1 | | R: | gerrymandered |

46. The bordering *south tampa* schools are extremely over utilized, while the bordering *west tampa* are extremely underutilized.  The obvious solution is to shift the school boundaries southward, sending some of the white students from over-utilized *south tampa* to underutilized–majority minority– *west tampa* to balance out the utilization.  Rather than do this, the HCSB closed a minority school and left the bordering *south tampa* schools at a staggering 100-119% utilization despite their stated goal to reduce utilization to the 80% range.  The HCSB will not lower those utilization rates to the 80% range, because that would mean sending white students to bordering minority schools.

## Plant, Jefferson, and Blake High School

47. Plant is over capacity, yet 44% percent of it's students should not even be assigned there.  The 44% are distant predominantly white students who would otherwise be assigned to minority schools Jefferson and Blake.  It makes no sense why the school board would go out of its way to assign distant students to a school that is over capacity.

PLANT HIGH SCHOOL                JEFFERSON HIGH SCHOOL                BLAKE HIGH SCHOOL



| Accuracy: | 51% | Grade: | A | Accuracy: | 52% | Grade: | C | Accuracy: | 26% | Grade: | C |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minorities: | 31.1% | Utilization: | 101% | Minorities: | 91.2% | Utilization: | 63% | Minorities: | 76.4% | Utilization: | 90% |
| LS Exclusion: | 10% | FS Inclusion: | 44% | LS Exclusion: | 27% | FS Inclusion: | 34% | LS Exclusion: | 49% | FS Inclusion: | 63% |
| Displacement: | 0.14:1 | R: | gerrymandered | Displacement: | 0.74:1 | R: | gerrymandered | Displacement: | 0.55:1 | R: | gerrymandered |

11

48. The following map shows the locations and boundaries for Plant High
    School (orange), Jefferson High School (yellow), and Blake High School
    (purple):



49. Plant High School is nearly *twice* as far from Davis Island as Blake High
    School is by ground transportation, yet students in that affluent white en-
    clave are not assigned to Blake, a predominantly African-American school.

50. Similarly, the neighborhoods of Westshore Palms, North Bon Air, Beach
    Park, and Oakford Park are at least twice as close to Jefferson High School
    than Plant, and in some cases literally across the street from Jefferson, yet

those white students are assigned to Plant and the school district is unable to give a cognizable reason why.

51. The reason for the odd shape of the boundaries becomes clear when you overlay those boundaries over a map of the racial demographics, as illustrated in the following image:



52. The most egregious part is that Plant is overpopulated, and yet they still will not send those white students to predominantly minority Jefferson High School and Blake High School. The following image shows just how maladjusted the current Plant High School boundaries are, when overlaid with the boundaries for the closest high schools. The shaded area highlight portions of Plant High School's current boundary that are closer to Jefferson High School and Blake High School:



## Coleman, Madison, and Pierce Middle School

53. The situation with Coleman Middle School is similar to Plant High School: Coleman's boundary is artificially kept lower to exclude assigning the large African-American population directly to their north, despite them being significantly closer to Coleman than Pierce.



COLEMAN MIDDLE SCHOOL

PIERCE MIDDLE SCHOOL

MADISON MIDDLE SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 45% | Grade: | A |
| Minorities: | 28.3% | Utilization: | 104% |
| LS Exclusion: | 42% | FS Inclusion: | 31% |
| Displacement: | 1.59:1 | R: | gerrymandered |

| | | | |
|---|---|---|---|
| Accuracy: | 55% | Grade: | C |
| Minorities: | 93.3% | Utilization: | 69% |
| LS Exclusion: | 11% | FS Inclusion: | 40% |
| Displacement: | 0.19:1 | R: | gerrymandered |

| | | | |
|---|---|---|---|
| Accuracy: | 64% | Grade: | C |
| Minorities: | 72.2% | Utilization: | 58% |
| LS Exclusion: | 19% | FS Inclusion: | 23% |
| Displacement: | 0.79:1 | R: | gerrymandered |

54. Madison to the South of Coleman, is exerting pressure to move Coleman's boundaries up. But to avoid doing this, the School Board closed Monroe, to avoid sending white students to minority schools directly to the north.

55. The following image shows the locations of Coleman, Pierce, and Madison, overlayed over a map of race. The black lines represent the border for the closest school:



## North Tampa

### Carrollwood K-8

56. On May 9, 2023, Defendant promulgated a format change for Carrroll-wood Elementary, converting it from kindergarten through fifth grade ("K-5") to kindergarten through eighth grade ("K-8") effective August 2023 with the 2023-2024 school year for the sixth grade. *see* Exhibit J.

57. J.W. is starting the sixth grade for the 2023-2024 school year.

58. Defendant assigned Plaintiff's child J.W. to Adams Middle School–located at 10201 N Blvd, Tampa, FL 33612.

59. Carrollwood K-8 is located at 3516 McFarland Rd, Tampa, FL 33618.

60. Both Adams Middle School and Carrollwood K-8 are operated by Defendant.

61. Carrollwood K-8 has a non-compact boundary:

CARROLLWOOD ELEMENTARY SCHOOL



| | | | | |
|---|---|---|---|---|
| Accuracy: | 33% | Grade: | | A |
| Minorities: | 57.6% | Utilization: | 73% | |
| LS Exclusion: | 63% | FS Inclusion: | 21% | |
| Displacement: | 6.12:1 | R: | gerrymandered | |

62. The children it includes in the yellow and green areas are significantly more White than the excluded red areas.

63. The children it excludes to the south of Gunn Highway and Busch Boulevard are predominantly Latino and African-American.

64. The children it excludes to the east are significantly more likely to be African-American or Latino than the children it included in the green and yellow areas.

## Hill Middle School

65. Hill has a non-compact boundary:

### HILL MIDDLE SCHOOL



| | | | |
|---|---|---|---|
| Accuracy: | 37% | Grade: | B |
| Minorities: | 68.6% | Utilization: | 83% |
| LS Exclusion: | 46% | FS Inclusion: | 43% |
| Displacement: | 1.11:1 | R: | gerrymandered |

66. Hill's assignment boundary is being manipulated to protect two bordering white schools: A-rated Carrollwood K-8 and A-rated Martinez Middle School. Nearby affluent white students who should be assigned to Hill, are instead assigned to Martinez and Carrollwood. To fill those student seats back up, they gerrymandered the boundary to pull in distant minority neighborhoods that the A-rated schools do not want. The result is a significantly higher concentration of minorities at Hill, and a decrease of minority enrollment at Martinez and Carrollwood.

## Lake Magdalene Elementary

Lake Magdalene's boundary was just changed for the 2024-2025 school year. They reassigned a large swath of white students from Miles Elementary to Lake Magdalene, despite those students being significantly closer to Miles. Miles is a low performing minority school, and the reassignment of these white students only further concentrated minorities there. The school board gerrymandered the Miles boundary so hard, that it now resembles a penis and testicles:

MILES ELEMENTARY SCHOOL



| | | | |
|---|---|---|---|
| Accuracy: | 28% | Grade: | C |
| Minorities: | 90.9% | Utilization: | 81% |
| LS Exclusion: | 56% | FS Inclusion: | 54% |
| Displacement: | 1.08:1 | R: | gerrymandered |

### Miles Elementary

67. The School Board juiced the numbers it told the public on it's boundary
website to try to justify changing Miles' boundary. The website indicates
that Miles' utilization is around 109% to justify relocating a large portion of
it's white students to Lake Magdalene away from predominantly minority
Miles. Yet the numbers the School Board reports to the state indicates
that Miles' utilization is 81%. Miles is not over capacity, the School Board
lied to segregate it:

| Miles Elementary | | | Remove |
|---|---|---|---|
| School level | | | ES |
| Enrollment (school year 2021-22) | | | 794 |
| Capacity | | | 726 |
| Utilization (school year 2019-20) | | | 117% |
| Utilization (school year 2020-21) | | | 108% |
| Utilization (school year 2021-22) | | | 109% |

| Metric | Existing | S4 | S5 |
|---|---|---|---|
| Anticipated utilization | 113% | 87% | 87% |
| Assigned pupils rezoned | 0 | 228 | 228 |
| Anticipated utilization (with temporary classrooms) | 109% | 84% | 84% |
| Capacity (with temporary classrooms) | 754 | 772 | 772 |
| Capacity | 726 | 747 | 747 |
| Anticipated enrollment | 821 | 652 | 652 |
| Total assigned pupils | 1,259 | 986 | 986 |

### Gaither High School

68. Gaither has a non-compact boundary:

GAITHER HIGH SCHOOL



| | | | |
|---|---|---|---|
| Accuracy: | 30% | Grade: | B |
| Minorities: | 62.9% | Utilization: | 98% |
| LS Exclusion: | 65% | FS Inclusion: | 29% |
| Displacement: | 4.49:1 | R: | gerrymandered |

69. Mr. Warner resides on the edge of the Gaither red area, yet his home is assigned to Chamberlain High School. In 2022, Gaither's enrollment was 62.9% minority, in contrast to Chamberlain's 88.1%.

## Chamberlain High School

70. Gaither has a non-compact boundary:

CHAMBERLAIN HIGH SCHOOL



| | | | |
|---|---|---|---|
| Accuracy: | 38% | Grade: | C |
| Minorities: | 88.1% | Utilization: | 63% |
| LS Exclusion: | 52% | FS Inclusion: | 34% |
| Displacement: | 2.10:1 | R: | gerrymandered |

71. Mr. Warner resides on the edge of the green and yellow area that borders Gaither's boundary. There was a huge red area of students that were much closer than Mr. Warner, yet they excluded them and assigned him there instead to dilute minority enrollment at Gaither.

## 1.  Boundary Changes

72. The School Board promulgated controversial district wide boundary changes for the 2024-2025 school year on June 20, 2023 with a 4-3 vote, over the objections of minority members who were opposed to the disproportionate nega-

tive impact that the changes would have have African-American and Hispanic communities.

73. The white board members (along with a Moroccan), with an additional seat obtained through illegal gerrymandering, overrode the minority members to cram through the changes in a sharply divided 4-3 vote.

## 2.   Assignment Shenanigans

74. Everytime the School Board creates a K-8, they always make the 6-8 boundary the exact same as the PK-5.

75. This is done because elementary boundaries are significantly smaller than middle school, so its easy to segregate.

76. Each and every time the school board creates a K-8, it is due to community pressure to segregate: either to pack white kids in, or to pack black kids in.

77. Sulphur Springs K-8 packs poor performing minorities into a small school.

SULPHUR SPRINGS K-8 SCHOOL



| | | | |
|---|---|---|---|
| Accuracy: | 16% | Grade: | C |
| Minorities: | 95% | Utilization: | |
| LS Exclusion: | 83% | FS Inclusion: | 12% |
| Displacement:34.94:1 | | R: | gerrymandered |

78. Carrollwood K-8, Maniscalo K-8, and Lutz K-8 were all designed to segregate and isolate affluent white families from having their children assigned to nearby minority middle schools.



CARROLLWOOD ELEMENTARY SCHOOL         MANISCALCO K-8 SCHOOL         LUTZ K-8 SCHOOL

| Accuracy: | 33% | Grade: | A |
|---|---|---|---|
| Minorities: | 57.6% | Utilization: | 73% |
| LS Exclusion: | 63% | FS Inclusion: | 21% |
| Displacement: | 6.12:1 | R: | gerrymandered |

| Accuracy: | 54% | Grade: | A |
|---|---|---|---|
| Minorities: | 59.7% | Utilization: | 79% |
| LS Exclusion: | 31% | FS Inclusion: | 27% |
| Displacement: | 1.22:1 | R: | gerrymandered |

| Accuracy: | 56% | Grade: | A |
|---|---|---|---|
| Minorities: | 37.4% | Utilization: | 86% |
| LS Exclusion: | 9% | FS Inclusion: | 40% |
| Displacement: | 0.15:1 | R: | gerrymandered |

79. The school board also play games by not assigning children to certain schools, even if those children live across the street. Walker Middle School is a great example of this. The School Board does not assign students to Walker, because they know under-performing minorities attend the school they are assigned the vast majority of the time, and they wanted that school to have a good grade. So they made it 100% lottery based to discourage minorities from attending.

## Fair Housing Act

80. Hillsborough County home buyers and renters frequently make decisions on which neighborhoods to purchase or rent based substantially on the public schools that are assigned to properties.

81. The assigned schools are provisioned services and/or facilities in connection with the residence that is assigned to them.

82. The HCSB is the entity who assigns public schools to specific residences, usually through the promulgation of a boundary map.

83. Promulgating school boundary maps that unlawfully segregate by race under the EEOA is de facto racial discrimination under the Fair Housing Act.

84. At all times relevant, there has been at least one residential real estate property for sale in each of the affected neighborhoods.

85. "Steering" is the practice of influencing a buyer's choice of communities based upon one of the protected characteristics under the Fair Housing Act, which are race, color, religion, gender, disability, familial status, or national origin.

86. "Redlining" is a discriminatory practice that puts services (financial and otherwise) out of reach for residents of certain areas based on race or ethnicity, often times by drawing lines on maps.

87. The HCSB artificially inflated the property values in *south tampa* by racially segregating white students into white schools to fabricate "A-rated" schools by excluding minority students.

88. On the flip side, this caused the schools that were deprived of those white students to get less resources and lower school grades, which depressed property values in homes assigned to those manufactured minority schools.

89. This pricing imbalance steered minorities to minority neighborhoods that they could only afford due to HCSB segregation based pricing manipulation, and affluent white people to the segregated white neighborhoods, further entrenching the segregation. Effectively redlining along the HCSB's segregated school boundaries.

# II   Disparate Treatment

90. diminution in property values "Any discrimination in housing that is based on un-supported stereotypes, prejudices, fear stemming from ignorance or generaliza-tions, or aversion toward the handicapped is illegal.". Epicenter of Steubenville v. City of Steubenville, 924 F. Supp. 845, 851 (S.D. Ohio 1996).

91. A plaintiff need not prove that discrimination was the sole motivating factor in the challenged action; it is sufficient that he show that discrimination was a moti-vating factor. Community Services, Inc. v. Wind Gap Municipal Authority, 421 F.3d 170, 177 (3d Cir. 2005); Regional Economic Community Action Program, Inc. v. City of Middletown, 294 F.3d 35, 49 (2d Cir.), cert. denied, 537 U.S. 813 (2002); Community Housing Trust v. Dep't of Consumer and Regulatory Affairs, 257 F. Supp. 2d 208, 225 (D.D.C. 2003); Sunrise Dev., Inc. v. Town of Huntington, 62 F. Supp. 2d 762, 774 (E.D.N.Y. 1999).

92. A municipality may be liable for actions that deny housing opportunities because of discriminatory animus by its constituents, i.e., "for effectuating the discrimi-natory wishes of the body politic," even though the local officials did not them-selves inflame, direct, or encourage such discriminatory sentiments. United States v. City of Chicago Heights, No. 99 C 4461, 1999 WL 1068477 at *5 (N.D. Ill. Nov. 19, 1999).

93. The School Board acquiesced to their constituents pressured adopt known racially discriminatory school assignment boundaries.

## Property Values

94. The Superintendent freely admits to manipulating property values through as-signed schools in a news interview[3]:

---

[3]*see* Exhibit F, https://www.wfla.com/news/hillsborough-county/hillsborough-county-schools-superintendent-to-present-re-zoning-recommendation-to-school-board/

"We moved the school district from number 35 in the state to number 19th. We reduced the number of historical "D" and "F" schools in this school district. The number of "D" and "F" schools we reduced the number of persisting and low performing schools. we increased the percentage of A, B, and C schools. And what *that* does is, that increases property values. The more we continue to address our high quality education within within everyone of our schools."

-Addison Davis

95. On June 21, 2023, WTSP 10 Tampa Bay published an article titled "Hillsborough County Schools redistricting plan sparks concerns over property values"[4]

96. In that article, The President of Greater Tampa Realtors stated that the redistricting will change Hillsborough County Property values.

97. They also quoted parents who stated that they made housing purchasing decisions based on the assigned schools:

"Concerned parents are now speaking out about how the changes could impact their children's education and their property value."

"'That's why I bought my house in this area, for the schools,' said Elena Ivani, the mother of two young boys."

"Ivani said when she and her husband were house hunting eight years ago, they were only looking at A-rated public school districts."

"If I wanted them to go to private school, we would have stayed in the house we were in and put that money towards private education,"

"'I'm hoping my home's value at least stays level, but in all honesty, would you pay a premium for a C-rated school?' Ivani asked."

---

[4] *see* Exhibit K. https://www.wtsp.com/article/news/local/hillsboroughcounty/hillsborough-county-schools-redistricting-plan-property-values/67-979bab7e-012f-437e-8530-26a69ae58958

"'I'm most likely moving in three years,' said Ivani."

98. About 88 percent of Hillsborough County students are educated at public schools, and 12 percent at private schools.

99. Public education has traditionally been tied directly to housing through residential assignment policies that assign homes to schools via school attendance zones.

100. Housing is the traditional gateway to public education.

101. School zones are typically designed so that students attend schools near home, and despite growing opportunities to opt out or choose another school via charters, magnets, and public school open enrollment policies, 71 percent of students attend their assigned public school.

102. Families with children predictably take housing selection seriously, as housing often determines children's access to educational opportunities.

103. At least half of households with children consider school district quality when selecting a neighborhood during home buying.

104. Homes assigned to poor performing schools will have less demand from those households, therefore that home's value will decrease.

105. Homes that are assigned to well performing schools will have more demand from those households, therefore that home's will increase.

106. This chart shows the national values of homes vs the quality of the elementary school it is assigned:



107. The United States Census Bureau reports that the median household income for <u>black</u> households is $30,772 per year in Tampa, while the <u>white</u> households make nearly double at $59,390.

108. Any increase in property values will disproportionately price out more minorities from those neighborhoods.

109. Race is directly tied to property values: neighborhoods become more gentrified with higher concentrations of white residents the higher their property values are.

## Injury

110. As an African-American who has been the subject of discrimination throughout his life, Mr. Warner is particularly sensitive to discriminatory practices. Mr. Warner was insulted and emotionally distressed by the knowledge that school

aged students in his community were being discriminated against because of their race... in the year 2023.

111. Mr. Warner was and is saddened, angered, and insulted by the fact that the HCSB continues to operate a segregated school system.

112. Defendant's unlawful conduct proximately caused Mr. Warner to suffer the afore-mentioned emotions, which have manifested into stress, unpleasant rumination, mental strain, and feelings of indignity, hopelessness and anxiety about race dis-crimination in housing and the school system.

113. Between August 2017 and October 2022, Mr. Warner continuously resided in *south tampa* at residences assigned to A-rated schools Plant High School, Wilson Middle School, and Mitchell Elementary.

114. Due to HCSB's manipulation of property values, Mr. Warner was priced out of *south tampa* and had to relocate to relocate to *nouth tampa* where he was assigned to failing schools.

115. This increased segregation in both *south tampa* and *nouth tampa*.

116. Had The School Board assigned all students to their closest school, property val-ues in area of *south tampa* that Mr. Warner resided would have decreased, and he would have purchased a home there.

117. This move resulted in a loss of community for Mr. Warner.

118. Mr. Warner spent much of his childhood in *south tampa*. He attended Tinker Elementary, Monroe Middle School, and Robinson High School there.

## REDISTRICTING

119. Not only did the school board segregate the students, they segregated themselves. They drew district map boundaries that correspond directly to race: the Hispanic

population is packed into district 1, the African-American population into district 5, and white population into districts 2, 3, and 4.

120. 46% of Hillsborough County's population is non-Hispanic white, yet the board managed to gerrymander the districts to give white constituents mote voting power by giving them more board seats.

121. The School Board then used this slim white majority to cram through unpopular rebundary decisions that disproportionally harmed minority communities in District 5, such as the controversial closing of Just Elementary along a slim 4-3 vote.

122. This image shows the racial map overlaid with the district boundaries shown in blue lines:



123. The School Board has seven (7) board members, five of which are elected by constituents in their respective geographically defined voting districts, two (2) at-large county wide districts.

124. The School Board promulgates their own voting district maps.

125. A new district map was promulgated on December 16, 2021. *see* Exhibit R.

## 1.   School Board meeting

126. The School Board held a special called meeting on Dec 10, 2021, to discuss redistricting.  At that meeting, the board members made the following statements:

### Stacy Hahn

127.  "SO WHEN THE OPPORTUNITY TO REDISTRICT CAME UPON ALL OF US THIS YEAR, I THOUGHT THAT IT WAS THE PERFECT OPPORTUNITY TO CREATE AN HISPANIC SEAT ON THE SCHOOL BOARD TO REPRESENT OUR HISPANIC COMMUNITY"

"IT'S THE OPPORTUNITY TO CREATE THE SEAT, AND THEN IN 2024, HAVE HISPANIC REPRESENTATION FOR THAT COMMUNITY. SO THAT'S HOW I APPROACHED THIS TASK."

"BUT THE MAP DOES, BY FAR, PROVIDE THE HIGHEST HISPANIC POPULATION OF 46.6%, WHICH WOULD ENABLE HISPANIC MINORITIES THE OPPORTUNITY TO ELECT THEIR CANDIDATE OF CHOICE AND GUARANTEE A SCHOOL BOARD MEMBER SEAT"

"NOW LET ME JUST DISCUSS MAP E SPECIFICALLY AND SOME OF THE HIGHLIGHTS OF MAP E. FIRST OF ALL, ANOTHER THING THAT MS. GRAY SAID THAT I'M GOING TO PUSH BACK ON HERE IS THAT SHE MENTIONED THAT MAP F HAD THE HIGHEST HISPANIC COMMUNITY. AC-

TUALLY, MAP E DOES AT 46.6%. MAP F IS AT 44.9%. 1.7% MAY NOT SEEM
LIKE A BIG DIFFERENCE, BUT IT'S CLOSE TO 10,000 VOTES THAT YOU
WOULD BE TAKING AWAY FROM THE HISPANIC COMMUNITY WITH
MAP F. I DON'T THINK – I WOULD THINK IF YOU TOOK 10,000 VOTES
AWAY FROM YOUR DISTRICT, MEMBER SHAKE TODAY, YOU AND YOUR
CONSTITUENTS WOULD BE UPSET. I'M SAYING THAT BECAUSE 10,000
VOTES IS A LOT OF VOTES AND A LOT OF PEOPLE"

"WITH MAP E, NOT ONLY IS IT ONE OF THE HIGHEST AT 40.6, BUT IT
ALSO CREATES AND GUARANTEES A HISPANIC SEAT"

"SO I UNDERSTAND WHEN YOU SAY, OKAY, CERTAIN PEOPLE WHO VOTED
FOR YOU ARE NOW GOING TO BE TAKEN OUT OF THAT DISTRICT, YOU
GET TO CONTINUE TO SERVE IN YOUR SEAT, BUT IT'S NOT – IT'S ABOUT
THE ADVOCACY. IT'S ABOUT HAVING A PERMANENT ADVOCATE FOR
THE HISPANIC COMMUNITY THAT PERSONALLY UNDERSTANDS THEIR
NEEDS AND CHALLENGES. SO, YOU KNOW, THAT'S REALLY A CON-
CERN FOR ME."

## A. Karen Perez

128.   "THE MAP THAT I SUBMITTED HAS ONE OF THE HIGHEST HISPANIC
POPULATIONS IN DISTRICT ONE. AND IT'S PROJECTED TO GROW AN-
OTHER 5.4 OVER THE NEXT DECADE. SO MAP F ACTUALLY UNITES
HILLSBOROUGH COUNTY'S HISPANIC COMMUNITY EVEN BETTER THAN
THE CURRENT MAP."

"MAP F HAS BY FAR THE LARGEST AFRICAN AMERICAN POPULATION
IN DISTRICT 5 OUT OF 41.1% OF THE POPULATION BEING BLACK. THE
LARGEST INCREASE IN HILLSBOROUGH COUNTY IN HISTORY. NONE
OF THE HISTORICALLY BLACK DISTRICTS IN HILLSBOROUGH COUNTY,
TAMPA CITY COUNCIL, THE COUNTY COMMISSION OR THE SCHOOL
BOARD HAVE EVER HAD A MAP THAT INCREASED THE BLACK POPU-
LATION IN THAT DISTRICT. THIS ENORMOUSLY."

### B.  Henry Washington

129.  "WHAT I'M LOOKING AT IS INCREASING THE LARGEST BLACK POPULATION. AND I DON'T EVER WANT TO DECREASE THAT IN DISTRICT 5."

"ALSO, FOR EXAMPLE, PROGRESS VILLAGE, I CAN NEVER UNDERSTAND WHY WE DIVIDE PROGRESS VILLAGE. THAT'S PRETTY MUCH PREDOMINANTLY A BLACK AREA. HALF OF THE AREA GOES TO ANOTHER DISTRICT, THE OTHER HALF GOES TO DISTRICT FIVE. SO I WANT THE DISTRICTS TO UNDERSTAND THAT I WANT MY PEOPLE TO BE TOGETHER IN THOSE AREAS"

"AND I'M HERE TO REPRESENT DISTRICT 5 HISPANICS. I HAVE HISPANICS IN MY AREA. I REALLY DO, BUT I'M HERE TO REPRESENT DISTRICT 5. AND TO ME, MAP F GIVES ME THE BEST OPPORTUNITY TO REPRESENT DISTRICT 5.".

### C.  Nadia Combs

130.  "SO THAT'S WHY I PERSONALLY VOTED FOR THAT AS NUMBER SIX. AND I WANT TO KEEP THE HISPANIC COMMUNITY TOGETHER. OBVIOUSLY. I AM OUT THERE. I AM VERY ACTIVE. AND I THINK YOU DON'T HAVE TO BE HISPANIC TO REPRESENT AND FIGHT FOR HISPANICS IN THIS DISTRICT. SO FOR ME, THAT IS WHY I WOULD CHOOSE MAP F BASED ON THE WAY I BASICALLY CATEGORIZE MINE. SO THANK YOU SO MUCH."

### D.  Melissa Snively

131.  "IT CREATES HISPANIC DISTRICT. MAYBE WE NEED TO TWEAK IT IF MEMBER COMBS IS NOT LIVING IN IT."

### E.   Lynn Gray

132. "AND LAST, DISTRICT 5, WE DID ENSURE THAT IT HAS THE HIGHEST BLACK POPULATION."

## 2.   Promulgated Map

133. The HCSB stated "Given the population distribution in Hillsborough County, having a high black population in District Five maximizes the opportunity for a minority candidate to be elected.  When considering the demographic profile of each map, any map that identified a significant reduction in the black population in District Five was discarded". *see* Exhibit R.

134. The HCSB stated "The black population percentage for district five .. is 41.1%". *see* Exhibit R.

135. The black population percentage for Hillsborough County is approximately 18%.

## 3.   Predominant Factor

136. The school board used race as the predominant factor when drawing the map to concentrate African-American voters into District 5, and Hispanic voters into District 1.

137. This artificially created high concentrations of White voters in Districts 2, 3, and 4.

138. Districts 2, 3, and 4 all elected White representatives.

139. Some board members were motivated to maximize their chances of re-election.

140. Specifically, Henry Washington desired to pack a high concentration of African-American voters into District 5 to maximize his chances of re-election.

141. Stacy Hahn and Melissa Snively were all too happy to accommodate Henry Washington's desire, to keep African-Americans out of their district to maximize their own chances of re-election.

142. The push to pack Hispanics into District 1 kept them out of White districts 2, 3, and 4.

143. Race-based considerations were not simply a factor when redrawing district lines, they were the predominant factor.

144. The board members were actually bragging about whose map could pack the most minorities into isolated districts.

145. When they weren't referencing voters explicitly by race, they did so through pretextual phrases such as "keeping the community together".

146. The United States Census reports the following racial demographics for Hillsborough County: 18.5% African American, 30.5% Hispanic, 46% White non-Hispanic.

147. The county is majority African-American and Hispanic, yet the majority of the School Board seats went to White candidates.

148. The School Board achieved this result by diminishing the influence of African-American and Hispanic voters by packing them into their own respective districts.

149. Racial gerrymandering "reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole.". Shaw v. Reno, 509 U.S. 630, 650 (1993).

150. At the time of the last election, Mr. Warner resided in White District 2 and had his vote diluted. He currently resides in District 3, and again has his voted diluted.

151.  The School Board ensured that a Hispanic board member was not even elected to the Hispanic district they just packed, by rejecting any maps that placed Member Combs' home outside of District 1 so that she would continue to be eligible to run for the District 1 seat. Member Combs is not Hispanic.

## 4.  COMPACTNESS

### A.  POLSY-POPPER MEASURE

152.  The Polsy-Popper score is a commonly used measure of compactness for voting maps that compares the boundary shape to a square that has the same perimeter as the boundary by calculating the area ratio between the two. It quantifies how contorted the boundary is. It is expressed as a ratio between 0.0 and 1.0, with 1.0 being the most compact.

$$PPM = \frac{4 * area(B)}{perimiter(B)^2} \tag{5}$$

153.  None of the five districts are compact as measured by the approximate polsy-popper scores:

District 1: 0.74

District 2: 0.57

District 3: 0.53

District 4: 0.38

District 5: 0.41

### B.  REOCK MEASURE

154.  The Reock score is another commonly used measure of compactness for voting maps that compares a boundary shape to the minimum-bounding square by calculating the ratio of the boundaries occupied space within that minimum-bound square. It quantifies how stretched out the bound-

ary is.  It is expressed as a ratio between 0.0 and 1.0, with 1.0 being the most compact.

$$RM = \frac{area(B)}{max(width(B), height(B))^2} \qquad (6)$$

155. None of the five districts are compact as measured by the approximate Reock scores:

District 1: 0.64

District 2: 0.69

District 3: 0.67

District 4: 0.47

District 5: 0.50

## INTENT

156. The fact that the school boundaries correlate nearly 1-to-1 directly to race.

157. The fact that the school board explicitly used race to draw the district maps to segregate.

158. The fact that the HCSB has a history of refusing to desegregate.

159. The fact that the HCSB was notified several times that they were in violation of the EEOA, and provided racial maps and other evidence in support of that assertion, yet the HCSB ignored it and pressed forward with racial segregated maps and proposals.

160. The fact that Blake High School was the negro High School in the 50's before desegregation, and it remains a segregated negro High School in 2023 due to the obvious gerrymandering of Blake High School.

161. The fact that white students across the street from Jefferson High School are not assigned to Jefferson High School.

162. The affluent white residents of *south tampa* wield tremendous political influence in relation to the other parts of Hillsborough County.

163. Those affluent white *south tampa* residents are currently exerting tremendous pressure on the HCSB to not implement certain proposed school boundary changes that would assign some of their homes to Jefferson High School, despite their homes being geographically closer to Jefferson, because generally they do not want their children attending Jefferson High School (a low performing minority school) and because their property values will drop if their homes are reassigned from A-rated Plant High School to C-rated Jefferson High School.

164. Superintendent Addison Davis has capitulated to this political pressure, and has expressed assurances to certain school board members that he will not submit the proposal that reassigns white students to Jefferson High School, while publicly stating that no decision has been made:

 **Tim McGaughey**  Author  Group expert
There was a question about where the superintendent stands on this so far. Dr. Hahn commented that there was a soft commitment to keep the 130 families in the district.

Note: I assume this referenced scenario 2 and WBA, WSP.

1d                                                                     3

165. The school board members are poised to approve yet another racially segregated map, despite knowing full and well that those maps are racially segregated, because they lack the political courage to overcome that political pressure from *south tampa* residents:



**Tim McGaughey** Author Group expert
I was very disappointed in this meeting overall. The fact that people were repeatedly asking or stating the same thing didn't help. Ultimately, one of the things that really bothered me about this meeting was how politically charged it was.
* A neighbor brought up politics and complained about the makeup of the board.
* Dr. Hahn discussed politics for several minutes and complained about some of her other board members.
* Martin Garcia was asked about a legal opinion and instead said that the superintendent and a few board members were trying to cram this down, that Dr. Hahn was the only reasonable board member and that everybody needed to work to elect other board members.
1d                                                                                    👍 3

**Tim McGaughey** Author Group expert
Part of why this all bothered me is that I felt the positions of the other board members was very mis-represented. Claiming that Dr. Hahn is the only one interested in this is just clearly not true.

Also, the questions/comments were pretty much just about Plant. I can't recall a question about Grady, Mabry, or Coleman, which are also relevant to the area.

Plus of course, the HOA comments.
1d                                                                                    👍 5

**Rachel Nestor**
**Tim McGaughey** her speech at Plant felt like a political rally as well which is not appropriate in the slightest.
13h                                                                                   👍

166. School Board Member Stacy Hahn's comments about "fighting everyday" to keep District 2 (white) family's in District 2 schools (white).

167. A discriminatory purpose, not any legitimate reason, was a motivating factor behind Defendant's aforementioned discriminatory actions and/or omissions.

## STACY HAHN'S STATEMENTS

168. On or about January 11, 2023, Stacy Hahn gave a news interview with New Channel 8 WFLA[5].

169. This interview was broadcast on public television as well as printed on WFLA's website.

170. Stacy Hahn knew when she agreed to this interview, that it would be published and/or printed on television and/or the WFLA website.

171. During this interview, Stacy Hahn stated "I can tell you that I am fighting every day to make sure District 2 families stay in District 2 schools,".

172. There is no legal basis for District 2 families to stay in District 2. School boundaries routinely cross those arbitrary Districts, whose sole purpose is for electing school board members, not for school boundaries.

173. "District 2" is the racially gerrymandered Caucasian district that Stacy Hahn represents. "District 2"'s population is predominantly white.

174. District 1's population is predominantly minority and borders District 2 to the north.

175. Stacy Hahn's statement is dog whistling, telling white residents in South Tampa that she is fighting hard not to send their white children to a minority dominated schools in District 1.

176. Stacy Hahn's statement indicates a preference for white people to live and attend white schools in District 2, and consequently for minority students to attend schools in District 1.

---

[5] *see*   https://www.wfla.com/news/hillsborough-county/hundreds-attend-plant-high-school-meeting-to-protest-proposed-hillsborough-school-redistricting/

# DISPARATE IMPACT

177. The current school boundaries are arbitrary and the HCSB cannot have any legitimate objective for them because they violate the EEOA.

178. The current school boundaries disproportionately affect racial minorities by isolating them into under-performing schools, while the isolated white students excel in A-Rated schools.

179. This further harms the minority communities throughout Hillsborough County because their property values are decreased, while the property values increase in the segregated white neighborhoods.

# COUNTS

## COUNT I

### *42 U.S. Code § 3601 et seq: Disparate Treatment*

180. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

181. Defendant intended to unlawfully segregate students by race and/or color through *south tampa* school assignment boundary maps which are the terms, conditions, or privileges of a sale or rental of a dwelling, or the provision of services or facilities in connection therewith; or otherwise made housing unavailable by pricing minorities out of certain neighborhoods due to unlawful pricing manipulation.

## COUNT II

### *42 U.S. Code § 3601 et seq: Disparate Impact*

182. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

183. Defendant's school assignment boundary maps had a discriminatory effect on minority students in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race and/or color, or otherwise made housing unavailable by pricing minorities out of certain neighborhoods due to unlawful pricing manipulation.

## COUNT III

### 20 U.S. Code § 1703(c): Closest School

184. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

185. The EEOA declares unlawful segregation as "the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student".

186. Mr. Warner's home is 1.6 miles from Carrollwood K-8.

187. Mr. Warner's home is 2.3 miles from Adams Middle School.

188. Adams Middle School is a failing school with a D-rating from the Florida Department of Education ("FDOE").

189. Adams Middle School's student demographics are 29.65% black, 55.13% hispanic, and 7.05% white according to the FDOE.

190. Carrollwood K-8 is a good school with an A-rating from the FDOE.

191. Carrollwood K-8's student demographics are 7.56% black, 39.56% hispanic, and 41.78% white according to the FDOE.

192. Defendant created a greater degree of segregation when they assigned the African-American Plaintiff to further away minority school (Adams) despite there being a closer white school (Carrollwood K-8).

193. The School Board Denied Mr. Warner an educational opportunity by assigning his sixth grade child J.W. to Adams Middle School for the 2023-2024 school year, instead of Carrollwood K-8.

## COUNT IV

### *42 U.S.C. § 2000d et seq: Disparate Treatment*

194. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

195. 42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.".

196. Defendant receives federal financial assistance to fund it's school programs.

197. Defendant intentionally discriminates on the basis of race and/or color in it's school assignment boundaries.

## COUNT V

*42 U.S.C. § 2000d et seq: Disparate Impact*

198. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

199. 42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.".

200. Defendant receives federal financial assistance to fund it's school programs.

201. Defendant's school assignment boundaries have a discriminatory effect on the basis of race or color.

# COUNT VI
### *42 U.S.C. § 1983: Due Process*

202. Plaintiff re-alleges and incorporates by reference ¶ 1 - 9

203. The School Board opened a school choice application window on July 10, 2023.

204. That same day, Mr. Warner logged into the School Board's school choice application website to apply for School Choice for his child J.W. to get into Carrollwood K-8 and another school.

205. The website presented a list of schools to Mr. Warner to choose from, however Carrollwood K-8 was not on the list so he was unable to apply for that school.

206. However, the other school was available so Mr. Warner applied to it.

207. Mr. Warner then tried to apply for "Hardship" to get into Carrollwood K-8, however he was prevented from doing so unless he withdrew his application to the other school.

208. While Mr. Warner might assume the School Board believe the school is over capacity and decided not to list it, Mr. Warner still has a right under Florida law to apply to a) get a response that the school is over capacity and b) be put on a waiting list to be notified if capacity becomes available throughout the year.

209. Additionally, even if Mr. Warner was able to apply for Hardship, the criteria for being accepted is arbitrary and capricious. There are no requirements or procedures for being accepted to hardship, the School Board just wants you to submit a 2000 character essay explaining "a compelling reason for this hardship request".

210. Florida is a controlled open enrollment state: School Boards have a non-discretionary ministerial duty to "allow a parent from any school district in the state ... to enroll his or her child in ... any public school ... that has not reached capacity in the district ... The school district ... shall accept the student, pursuant to that school district's or charter school's controlled open enrollment process"[6].

211. Mr. Warner have a clearly established right to enroll in any public school that is below capacity. *see* Fla. Stat. § 1014.04, Fla. Stat. § 1002.20, Fla. Stat. § 1002.31, and the fundamental right of parents to direct the care, upbringing, and education of their children under Fourteenth Amendment of the United States Constitution.

212. Defendant has deprived Mr. Warner of those clearly established rights and liberties through their actions complained of herein.

---

[6]*see* Fla. Stat. § 1002.31(2)(a)

213. The school board has no "open enrollment process" for Carrollwood K-8.

214. The school board has implemented a written policy[7] of blanket refusing all general choice applications for Carrollwood K-8 in violation of Fla. Stat. § 1002.31.

215. Mr. Warner is not eligible to apply for choice hardship because Carrollwood K-8 is not capped / at-capacity. *see* Exhibit J.

216. Mr. Warner has no procedural way to apply for general choice admission into Carrollwood K-8 for the 2023-2024 school year.

217. The expanded Carrollwood K-8 has available capacity for the 2023-2024 school year. *see* Exhibit J pp. 2 - 3.

218. Mr. Warner has exhausted all administrative remedies, though that is not required to bring a 1983 due process claim. *see* Monroe v. Pape.


# Count VII
### *42 U.S.C. § 1983: Equal Protections - District Map Gerrymandering*

219. Plaintiff re-alleges and incorporates by reference ¶ 1 - 6

220. Plaintiff re-alleges and incorporates by reference ¶ 20 - 22

221. Plaintiff re-alleges and incorporates by reference ¶ 119 - 155

222. The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws."

---

[7] "General school choice options will be closed for Carrollwood PK-8". *see* Exhibit J pp. 3

223. Under the Fourteenth Amendment's Equal Protection Clause, a racial classi-
fication is prohibited unless it is narrowly tailored to serve a compelling state
interest.

224. As alleged in detail above, race was the predominant factor in the design of
all five Miami City Commission districts. Race predominated over all other
redistricting criteria when each of these districts was drawn.

225. Thee use of race as the predominant factor in creating the districts was not
narrowly tailored to advance any compelling state interests, including compli-
ance with the Voting Rights Act.

226. Map-drawing in which race predominates, subordinating traditional, race-neutral
redistricting considerations to racial decision-making, is presumptively in-
valid under the Equal Protection Clause.

227. Consequently, the districts do not survive strict scrutiny.

228. Therefore, the districts violate Mr. Warner's rights under the Equal Protec-
tion Clause and 42 U.S.C. § 1983.

## Count VIII
### *Art. IX, § 1(a), Fla. Const.: Free Public Education*

229. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

230. Art. IX, § 1(a), Fla. Const. states:

> "Adequate provision shall be made by law for a ... high quality system of free public
> schools"

231. The School Board's manipulation of housing property values results in an
additional fee that parents must pay to attend certain public schools in the

form of higher rents or higher home sales prices. The fee that must be paid is the difference between the manipulated housing prices minus the price that housing would be but-for the School Board's pricing manipulation.

# Count IX

### *Art. IX, § 1(a), Fla. Const.: Uniform Public Schools*

232. Plaintiff re-alleges and incorporates by reference ¶ 1 - 6

233. Plaintiff re-alleges and incorporates by reference ¶ 20 - 79

234. Art. IX, § 1(a), Fla. Const. states:

> "Adequate provision shall be made by law for a uniform, [and] efficient ... system of free public schools"

235. School attendance boundaries are promulgated via administrative law.

236. Gerrymandered school attendance zones that assign a substantial amount of students to schools other than the one closest to their place of residence is neither uniform nor efficient regardless if such assignments have a racially discriminatory effect.

237. Gerrymandered school attendance zones that assign a substantial amount of students to schools other than the one closest to their place of residence that exacerbates racial segregation is neither uniform nor efficient.

# III   Relief

Plaintiff respectfully requests that this court:

## School Assignment Map Challenges

1. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of the Fair Housing Act; and

2. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of Title VI of the Civil Rights Act; and

3. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of Art. IX, § 1 of the Florida Constitution ; and

4. enter a permanent injunction enjoining Defendant from promulgating any school assignment boundary maps complained of herein that violate the previous declarations; and

5. enter an order directing Defendant to redraw it's school assignment boundaries that complies with all federal, state laws, and this court's orders; and

6. award Plaintiff compensatory damages and punitive damages; and

7. award Plaintiff costs of suit and reasonable attorney fees; and

8. grant whatever additional relief this Court deems appropriate and just under the circumstances.

## EEOA Challenges

9. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of the EEOA; and

10. enter an order directing Defendant to redraw the Carrollwood K-8 assignment boundary map to be in compliance with the EEOA; and

11. enter an order directing Defendant to admit J.W. to Carrollwood K-8 for the 2023-2024 school year in compliance with the EEOA; and

12. award to the Plaintiff costs of suit and reasonable attorney fees; and

13. grant whatever additional relief this Court deems appropriate and just under the circumstances.

## Due Process

14. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of the Due Process Clause; and

15. enter an order directing Defendant to admit J.W. to Carrollwood K-8; and

16. award to the Plaintiff costs of suit and reasonable attorney fees; and

17. grant whatever additional relief this Court deems appropriate and just under the circumstances.

## District Map Challenges

18. declare the actions, omissions, policies, and procedures of the School Board, complained of herein to be in violation of the Equal Protections Clause; and

19. declare the 2022 school board election invalid with regards to Districts 2 and 4 seats; and

20. enter an order directing Defendant to hold a special election; and

21. award Plaintiff nominal damages; and

22. award Plaintiff costs of suit and reasonable attorney fees; and

23. grant whatever additional relief this Court deems appropriate and just under the circumstances.

## DEMAND FOR BENCH TRIAL

Plaintiff hereby demands a trial by judge on all issues.

## UNSWORN DECLARATION

I declare under penalty of perjury that the foregoing is true and correct. Executed on:

7-10-2023

_____

Date

_____

Signature

Blake Warner, *pro se*

2211 S. Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM

# Doc. 39

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BLAKE WARNER,

     Plaintiff,

v.                                 CASE NO. 8:23-cv-181-SDM-JSS

THE SCHOOL BOARD OF
HILLSBOROUGH COUNTY,
FLORIDA,

     Defendant.

_____/

**ORDER**

An order (Doc. 37) in *Warner v. The School Board of Hillsborough County, Florida*, No. 8:23-cv-1029-SDM-SPF (M.D. Fla.), dismisses the complaint for claim splitting, among other reasons, and directs Blake Warner to amend the complaint in this action and to assert all of his claims against The School Board of Hillsborough County, Florida. Warner amends (Doc. 38) the complaint. The motion (Doc. 27) to consolidate this action with *Warner*, 8:23-cv-1029-SDM-SPF; the motion (Doc. 32) to strike all of the School Board's affirmative defenses; and the motion (Doc. 34) for judgment on the pleadings are each **DENIED AS MOOT**. Because Warner asserts his own

claims only, the clerk must remove from the case caption "On behalf of himself and his minor child J.W."

ORDERED in Tampa, Florida, on July 11, 2023.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

- 2 -

# Doc. 42

# United States District Court
## For The Middle District of Florida
## Tampa Division

| | |
|---|---|
| BLAKE WARNER, ON BEHALF OF HIMSELF AND HIS MINOR CHILD J.W.<br><br>v.<br><br>THE SCHOOL BOARD OF HILLSBOROUGH COUNTY FLORIDA | Case Number 8:23-CV-181-SDM-JSS |

## Notice of Appeal to
## the Eleventh Circuit Court of Appeals

Plaintiff, Blake Warner, hereby gives notice that he is appealing Order (Doc. 37) entered on July 6, 2023, denying *pro se* status to Mr. Warner to represent his minor child J.W., to the United States Court of Appeal for the Eleventh Circuit[1].

---

[1] *see* Devine v. Indian River County School Board, 121 F.3d 576, 579 (11th Cir. 1997) ("We conclude that we have jurisdiction over non-final orders denying pro se status.").

# CERTIFICATE OF SERVICE

I certify that a copy hereof has been served to Defendant via CM/ECF.

_____
7-21-2023

Date

_____
Signature

Blake Warner, *pro se*

2211 S Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM

2